IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| DUCKS UNLIMITED, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:14-cv-02885-SHM-tmp |
| | ) | |
| BOONDUX, LLC and | ) | |
| CALEB SUTTON, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Ducks Unlimited, Inc. sues Defendants Boondux, LLC and Caleb Sutton alleging claims of copyright infringement, in violation of § 501 of the Copyright Act, 17 U.S.C. § 501; trademark infringement, in violation of § 32 of the Lanham Act, 15 U.S.C. § 1114; false designation of origin or sponsorship ("false designation"), in violation of § 43(A) of the Lanham Act, 15 U.S.C. § 1125(a); and trademark dilution, in violation of the Trademark Dilution Revision Act, 15 U.S.C. § 1125(c), based on Defendants' use of a logo in advertising, promoting, selling, and distributing merchandise bearing that logo. (ECF No. 1 ¶¶ 28-59 at 7-11.)

The Court held a bench trial on Plaintiff's claims against Defendants from March 27, 2017, to March 31, 2017. The parties

filed their proposed findings of fact and conclusions of law on May 12, 2017. (ECF Nos. 158, 158-1, 159.) The parties responded to each other's proposed findings of fact and conclusions of law on May 26, 2017. (ECF Nos. 160, 161.) The Court's findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52 follow.

## I. BACKGROUND

As provided by the Pretrial Order, the parties have agreed to the following summary of the case:

> Ducks Unlimited, Inc. is a non-profit corporation that is dedicated to waterfowl and wetlands conservation. Ducks Unlimited makes use of a logo, a drawing of the profile of a mallard's head, which is depicted below [(the "DU Logo")]:



> To promote and support its conservation efforts, Ducks Unlimited licenses the [DU Logo] to be used on a multitude of products. In January 2012, Caleb Sutton created a logo, which combines a fishhook and an antler in such a way that their combination forms the shape of a mallard's head (the "Boondux Logo"):



Sutton began selling decals, hats, t-shirts, and other products bearing the Boondux Logo, and formed a company, which was eventually named Boondux, LLC.

Ducks Unlimited filed suit against Boondux and Sutton ("Defendants") for trademark infringement, false designation of origin or sponsorship, trademark dilution, and copyright infringement based on Defendants' use of the Boondux Logo. Ducks Unlimited has filed this suit to stop Defendants from using the Boondux Logo and seeks a monetary recovery and attorney's fees from Defendants. Defendants oppose Ducks Unlimited's allegations and deny that they are liable to Ducks Unlimited for a monetary recovery or attorney's fees.

(ECF No. 146 at 3.)

## II. JURISDICTION

Each of Plaintiff's claims arises under federal law. The Court has subject-matter jurisdiction to adjudicate federal claims under 28 U.S.C. § 1331.

## III. FINDINGS OF FACT

### A. Stipulated Facts

As provided by the Pretrial Order, the parties have agreed that the following facts are not in dispute:

1. Ducks Unlimited is a not-for-profit corporation formed for the purpose of conserving, restoring, and managing wetlands and associated habitats for North America's waterfowl. Ducks Unlimited was founded in 1937.

2. Ducks Unlimited is the owner of a federal copyright registration for the [DU Logo] image, issued on July 14, 1980 to Ducks Unlimited Canada and assigned to Ducks Unlimited . . . by a written assignment of copyright dated September 10, 1985.

3    On March 7, 2002, Ducks Unlimited filed with the
     United States Patent and Trademark Office
     ("USPTO") an application to register the [DU
     Logo] on the Principal Register in International
     Class 35, for "association services -- namely,
     promoting the preservation of waterfowl."

4    On October 8, 2002, the USPTO registered the [DU
     Logo] trademark to Ducks Unlimited, Reg. No.
     2,631,699 in International Class 35 for
     "association services -- namely, promoting the
     preservation of waterfowl."

5    Plaintiff Ducks Unlimited is the owner of
     Trademark Registration No. 2,613,699, a design-
     only trademark that depicts a duck's head
     drawing, in International Class 35 for
     "association Services -- namely, promoting the
     preservation of waterfowl." The design
     registered in this registration is the [DU Logo].

6    Bass Pro Shops, an authorized retailer of items
     having the [DU Logo] printed on them, sells a
     number of Ducks Unlimited shirts. In the product
     description for every shirt sold online by Bass
     Pro Shops with the [DU Logo] appears the
     following statement: "It's all part of the Ducks
     Unlimited promise: Doing more to restore -- one
     garment at a time™."

7    Boondux has not been involved or affiliated with
     association services. Boondux sells its products
     strictly for commercial gain.

8    Boondux sells products that bear marks and
     designs other than the disputed Boondux Mark.

(ECF No. 146 at 11-12 (citations omitted).)

## B.  Facts Established at Trial

### 1.  Ducks Unlimited's Use of the DU Logo

Since 1937, Ducks Unlimited has conserved nearly 14 million

acres of wetlands and waterfowl habitat, completing conservation

projects in all 50 states, Canada, and Mexico. (ECF No. 152 at 39-41, 47-48.) As part of its mission, Ducks Unlimited educates its members and the general public about the importance of its work. (Id. at 49-50.) Its nationwide education efforts include public service announcements, newsletters, a television show, and radio shows. (Id.) About 450 to 500 employees and 55,000 volunteers nationwide contribute to Ducks Unlimited's mission. (Id. at 38.)

Ducks Unlimited's members and chapters play an integral role in furthering its mission. As of January 2012, Ducks Unlimited had 550,000 adult members and 45,000 youth members. (Id. at 51.) Today, the adult-membership figure is approximately 600,000. (Id. at 49.) Members include conservationists, waterfowlers, and people interested in hunting, fishing, and the outdoors generally. (Id. at 50-51.) Members join Ducks Unlimited in one of several ways. Some join by responding to an offer by mail or email or by seeking out Ducks Unlimited's website. (Id. at 58-59.) Others -- about two thirds -- join by attending Ducks Unlimited events, which are ordinarily organized by chapters. (Id. at 58.) Whether through a direct contribution or through the price of an event ticket, members join by making an annual $35 gift to the organization. (Id. at 55, 73.) The annual retention rate among members joining through events is about 50%; the rate among members who

join apart from events is about 55%.  (Id. at 73.)  Over 1 million people have made a financial contribution to Ducks Unlimited over the last three years.  (Id. at 74.)

Members are organized into chapters by geographic location. (Id. at 51.)  The chapters' primary purpose is fundraising. (Id. at 54.)  Ducks Unlimited has 2,800 chapters spanning all 50 states, and those chapters organize about 4,000 fundraising events annually.  (Id. at 53, 61; Tr. Ex. No. 7 (chapter map).) In Louisiana, there are 64 chapters with over 20,000 members. (ECF No. 152 at 53-54.)  Two chapters are in Baton Rouge, Louisiana (Sutton's hometown), both of which have existed since 1985.  (Id. at 53.)  Since before 2012, the Baton Rouge Chapter has maintained about 900 members, and an annual event organized by the Louisiana State University Chapter draws about 500 attendees.  (Id.)

Ducks Unlimited uses its DU Logo extensively in connection with its membership, chapter, and fundraising activities.  It uses its DU Logo in various member communications, including mail invitations, email "blasts," and press releases.  (Id. at 55-56; e.g., Tr. Ex. No. 27 (letterhead).)  The DU Logo is displayed in the welcome letter and on the membership card that members receive in their membership kits.  (ECF No. 152 at 55-56; Tr. Ex. No. 8 (letter & card).)  Also included in every kit are two automotive (or window) decals, one of which is the DU

Logo.  (ECF No. 152 at 56; Tr. Ex. No. 9 (decals).)  Ducks Unlimited has distributed over 10 million DU Logo decals to members over the last 20 years.  (ECF No. 152 at 57-58.)  Amy Batson, Chief Fundraising Officer for Ducks Unlimited, testified that she has seen the DU Logo decal displayed in all 50 states, Canada, and Mexico.  (Id. at 133-34.)

Members also receive an annual subscription to the Ducks Unlimited Magazine, which is published six times a year.  (Id. at 81-82; see ECF No. 153 at 67.)  The DU Logo always appears standing alone in the lower-right corner of the magazine's front cover and can be seen throughout the magazine.  (ECF No. 152 at 81-82; Tr. Ex. No. 17 (magazines).)  In 2012, the magazine had a circulation of 530,000 per issue; today that figure is 610,000.  (ECF No. 152 at 99.)  Since 2012, about 150 companies have advertised with Ducks Unlimited, primarily in the magazine.  (Id. at 80.)  Advertisements annually generate $3 to $4 million in revenues for Ducks Unlimited.  (Id. at 81.)

Chapters are permitted to use the DU Logo in chapter communications and in promoting fundraising events and chapter activities.  (Id. at 54.)  Ducks Unlimited provides guidance to chapters about how the DU Logo should be displayed.  (ECF No. 153 at 79-80.)  Chapters are given some latitude to tailor how they display the DU Logo for their own purposes, such as, for example, placing design elements around the logo or behind the

logo, but Ducks Unlimited does not authorize chapters to alter the DU Logo itself. (Id. at 80.) Ducks Unlimited allows the chapters a certain amount of deviation from the guidelines. (Id. at 81.) Doug Barnes, Creative Director for Ducks Unlimited, testified that he is not inclined to be overbearing in enforcing the guidelines as to loyal, small-dollar supporters or smaller chapters that are trying to raise money for Ducks Unlimited. (Id. at 59, 81-82.)

Ducks Unlimited makes available a variety of "incentive merchandise" goods that chapters may use at member and fundraising events. (ECF No. 152 at 54.) Chapters may order goods through fliers or through Ducks Unlimited's Event Merchandise Catalogue. (Id. at 59-63; Tr. Ex. No. 10 (fliers); Tr. Ex. Nos. 11, 12 (catalogues).) Such goods include duck calls, hats, cups, coffee mugs, trailer hitch covers, knives, bags, cell phone covers, can koozies, firearms, and home décor, all of which are designed to appeal to a national audience. (ECF No. 152 at 65.) The DU Logo is displayed on many of these items, either standing alone or with the words "Ducks Unlimited." (Id. at 61, 66.) The DU Logo has been featured regularly on goods in the catalogue for the last 20 years. (Id. at 67-68, 148-49.) Ducks Unlimited partners with "preferred vendors," companies licensed to provide DU Logo-branded merchandise for use at events. (Id. at 70-71.) Ducks Unlimited

also makes promotional merchandise, such as bags and apparel, available to members who join apart from events, and those goods usually display the DU Logo. (Id. at 72.)

Ducks Unlimited has used the DU Logo extensively since the late 1980's in conjunction with its Corporate Partners Program. (Id. at 157, 160.) Through that program, about 55 licensees are approved to sell Ducks Unlimited-branded products to the consuming public. (Id. at 165.) Since 1986, Ducks Unlimited has raised over $100 million in revenues from brand sponsorship, trademark licensing, and promotional activities through Corporate Partners. (Id. at 183.) The royalties Ducks Unlimited generates by licensing use of the DU Logo are a significant part of its fundraising efforts. (Id. at 76.) At trial, Jim Alexander, Senior Director of Corporate Relations for Ducks Unlimited, testified about the importance of the DU Logo to the Corporate Partners Program:

> The importance is high. So, the way we look at it is it's really everything we do. So, everything that Ducks Unlimited stands [for] as a brand is encapsulated into that one mark or that one identity. It's 80 years of conservation success. It's 13 and a half million acres of conservation delivery across the continent, decades of fundraising, decades of member engagements. So, it's all wrapped up into one mark that we're allowed to build that one identity from; and I believe that's what that represents and why it's so important.

(Id. at 162.)

Ducks Unlimited expects its licensees to be "good stewards of the brand" by performing well financially and by generating expected revenues. (Id. at 161-62.) Prospective licensees must fill out a trademark application, and Ducks Unlimited imposes quality standards in its agreements with licensees. (Id. at 167-69; Tr. Ex. No. 29 (trademark license application).)

When Ducks Unlimited authorizes licensees to use the DU Logo or other Ducks Unlimited-brand marks, it provides guidance and imposes restrictions on how licensees may graphically portray Ducks Unlimited's brand. Ducks Unlimited's 2003 Corporate Partners Graphics Standards Manual illustrates the design choices available to licensees. (Tr. Ex. No. 42.) Possible displays typically include the DU Logo standing alone, the words "Ducks Unlimited," or some combination of those words and the DU Logo. (Id. at 10.) Two such combination displays depict the DU Logo with the words "Ducks Unlimited" placed to the right of or below the DU Logo (the "DU Composite Logo"):





(Id. at 12-13.)  All of Ducks Unlimited's licensees use the DU Logo in some capacity, whether standing alone or in combination with Ducks Unlimited's name.  (See ECF No. 152 at 161.)

Ducks Unlimited targets a broad variety of consumers through commercial sales of Ducks Unlimited-branded goods.  (ECF No. 152 at 166.)  Those consumers range from people who have a specific appreciation for Ducks Unlimited's wetlands-conservation work to those who generally appreciate wildlife or the outdoors or who simply want to identify with the DU Logo by wearing shirts or displaying automotive decals.  (Id.) Alexander testified that, although Ducks Unlimited is a members-based organization, the sale of Ducks Unlimited-branded merchandise to the public allows Ducks Unlimited to be perceived as an inclusive, rather than exclusive, brand and appeal to a broader audience for engagement and support of its mission. (Id. at 167.)

Ducks Unlimited's licensees span a range of industries and products.  (Id. at 170.)  Product categories include home décor, automotive, automotive aftermarket, food and beverage, wine and

spirits, apparel, waterfowl accessories, firearms and ammunition, duck calls, license plates, trailer hitch covers, can koozies, leather belts, and automotive decals. (Id. at 170-79; Tr. Ex. Nos. 30 (baseball cap), 31 (fleece pullover), 32 (key chain), 33 (decals), 34 (license plate), 35 (socks), 36 (metal hitch cover), 37 (koozie), 38 (belt).) DU Logo decals are particularly popular among the consuming public: since 2007, between 250,000 and 260,000 decals, priced between $6.50 and $18.00 each, have sold at retail, generating $800,000 in revenues for Ducks Unlimited. (ECF No. 152 at 182-83.) Ducks Unlimited-branded products are carried by national retailers, such as Bass Pro Shops, Academy Sports + Outdoors, Gander Mountain, and Cabela's, as well as regional retailers, independent stores, and "mom-and-pop" shops. (Id. at 180-81.) Ducks Unlimited-branded products are sold by brick-and-mortar and online stores. (Id.) On the Internet, Ducks Unlimited-branded products are available to consumers through Ducks Unlimited's online store, licensees' websites, and third-party retail websites like Amazon and Etsy. (Id. at 181; ECF No. 153 at 36.)

Artisans has been Ducks Unlimited's official apparel licensee since 2007. (ECF No. 152 at 170; ECF No. 153 at 23-24.) Licensees like Artisans have sold apparel items displaying the DU Logo to the consuming public since 1991. (ECF No. 153 at

23-24.)  Apparel items include long- and short-sleeved t-shirts, vests, pullovers, sweatshirts, and polo shirts.  (ECF No. 152 at 170; ECF No. 153 at 29; Tr. Ex. Nos. 43-46 (catalogs).)  Those items are better described as "lodge wear" rather than "hardcore hunting" apparel.  (ECF No. 153 at 26.)  Price points range from $17 to $20 for t-shirts, $26 to $30 for performance t-shirts, and $40 to $90 for sportswear.  (Id. at 36.)  Hats sell for about $17.  (Id. at 37.)  Artisans sells Ducks Unlimited-branded apparel through catalogues, Ducks Unlimited's online store, and 200 retailers nationwide.  (Id. at 30-31, 35; Tr. Ex. Nos. 43-46 (catalogs).)  The DU Logo appears on 99% of the apparel items that Artisans sells.  (ECF No. 153 at 28.)

As part of its licensing agreement with Ducks Unlimited, Artisans must "stringently" follow Ducks Unlimited's guidelines and abide by quality and measurement standards.  (Id. at 24, 40.)  Michael Roberts, one of Artisans's general managers, testified that Ducks Unlimited gets "final approval over everything."  (Id. at 21-22, 40.)  On certain apparel items, Ducks Unlimited imposes specific requirements for displaying the DU Logo.  (ECF No. 152 at 185.)  Those requirements include that the name "Ducks Unlimited" or the initials "DU" must be in "close juxtaposition" with the DU Logo.  (Id.)  The "close juxtaposition" requirement is satisfied where, for example, the DU Logo appears on the left breast or the back yoke of a shirt

and the words "Ducks Unlimited" run down the shirt sleeve or appear on the garment's hangtag or sew-in label. (Id. at 185-86.) Ducks Unlimited imposes this "close juxtaposition" requirement for apparel items to be sold at retail pursuant to a settlement agreement into which Ducks Unlimited entered with a third-party company in 1990.[1] (Id. at 186-87, 194; Tr. Ex. No. 39 (settlement agreement).) The "close juxtaposition" requirement does not require apparel licensees to use some version of the DU Composite Logo. For example, in addition to producing shirts that use the DU Composite Logo, Artisans may -- and does -- produce shirts that display the DU Logo standing alone, so long as the words "Ducks Unlimited" (or the initials "DU") appear somewhere on the shirt, even if not visible when viewing the DU Logo. (See Tr. Ex. No. 44 at 4-5; Tr. Ex. No. 47 (shirt).)

Roberts testified about the importance of the DU Logo for Artisans's sales. He explained that "you don't have a Ducks Unlimited line without [it]." (ECF No. 153 at 29.) Roberts was asked about the difference between selling a plain Artisans apparel item and a Ducks Unlimited-brand Artisans apparel item. (Id.) He answered, "I can put the same product out there but

---

[1] The Court infers from Alexander's testimony that the "close juxtaposition" requirement does not apply to apparel provided directly to members or for chapter or event purposes, rather than for retail sale. (See ECF No. 152 at 193-94.)

without the Ducks Unlimited logo on it, . . . it really doesn't have any meaning to anybody and there's no reason for a retailer to put me in the store against other people because he's not going to draw those consumers." (Id.)  Since 1993, Artisans and its predecessor licensee have paid Ducks Unlimited over $6 million in royalties from apparel sales.  (Id. at 39.)

Ducks Unlimited maintains an online presence through its website, www.ducks.org, and through social media.  (ECF No. 152 at 83-84.)  Ducks Unlimited uses the DU Logo on these various platforms.  For at least 18 years, Ducks Unlimited has used its website for such purposes as member recruitment, member communications, advertising, and education, and Ducks Unlimited provides a page where users can shop for branded merchandise. (Id. at 83-85.)  The DU Logo appears on the homepage in the top-left corner as well as on other pages of the website.  (Id. at 84-85; Tr. Ex. Nos. 18, 19 (screenshots).)  Over 5 million unique devices (based on IP address) access the website in a given year, and in 2016, the website registered over 70 million "click-through" page views.  (ECF No. 152 at 100.)

Ducks Unlimited's social media presence spans Facebook, Instragram, Twitter, and YouTube.  (Id. at 83.)  Those platforms allow Ducks Unlimited to reach a larger, and often younger, audience than more traditional communications and marketing tools allow.  (Id. at 83, 87.)  Ducks Unlimited started its

Facebook page before 2012 and today has over 1 million fans. (Id. at 87.) It started its Instagram page in 2013 and currently has over 400,000 followers. (Id. at 93, 100-01.) Ducks Unlimited created its Twitter account in 2008 and its YouTube page in 2007. (Id. at 90, 102.) On each platform, the DU Logo is Ducks Unlimited's profile picture and appears whenever Ducks Unlimited makes a post or tweet. (Id. at 88, 90-91, 93-94; Tr. Ex. Nos. 20 (Facebook page), 21 (Twitter page), 22 (Instagram page), 23 (YouTube page).) Since 2010, Ducks Unlimited has offered several mobile apps for download, and the DU Logo is used as the thumbnail for those apps. (ECF No. 152 at 94-95; Tr. Ex. Nos. 24 (app thumbnail), 25 (app download screen).)

Ducks Unlimited has also used the DU Logo in public service announcements ("PSAs") aired on television and in its television shows.[2] Since 2012, Ducks Unlimited's PSAs have been aired both nationally and regionally on such networks as ABC, Fox News Network, CNN Airport Network, and the Travel Channel. (ECF No. 152 at 107-09.) In 2013 and 2016 combined, Ducks Unlimited PSAs

---

[2] Unlike regular commercial advertisements, television networks generally air PSAs without charge for organizations or causes they care about. (ECF No. 152 at 107.)

aired 6,000 times and generated 1.7 billion impressions.[3]  (Id.
at 110, 146.)  Since 1997, almost 200 episodes of the television
show "DU TV" have aired with a viewership of over 3.5 million
during the most recent season.  (Id. at 105-06, 147.)  The DU
Logo is frequently displayed on these PSAs and shows, both
through graphic design and on clothing worn by people on screen.
(Id. 105-07; Tr. Ex. No. 26 (PSA).)

The DU Logo is publicly displayed in additional contexts.
At the tradeshows in which Ducks Unlimited participates, the DU
Logo is visible on Ducks Unlimited's booth, on the clothing worn
by people staffing the booth, and on materials and fundraising
products offered in its booth.  (ECF No. 152 at 76-77.)  In
2014, 2015, and 2016, Ducks Unlimited participated in the
Louisiana Sportsman Show and the Mississippi Wildlife
Extravaganza.  (Id.)  Twenty-seven states, including Louisiana,
make specialty license plates available to motorists, all of
which feature the DU Logo.  (Id. at 78-80; Tr. Ex. No. 16
(sample plates).)  The Louisiana license plate was first made
available in the mid-2000s.  (ECF No. 152 at 99.)  At its
project sites, particularly sites located on public land, Ducks
Unlimited places signage that identifies Ducks Unlimited and
displays the DU Logo.  (Id. at 48-49.)  An approximately 130 x

_____

[3] Batson explained that "audience impressions" is a measure of
the estimated number of people who viewed a PSA.  (ECF No. 152
at 138.)

45-foot DU Logo fixture is mounted on the south side of the Bass Pro Shops at the Pyramid in Memphis, Tennessee, which can be seen from the I-40 Bridge and parts of Downtown Memphis. (Id. at 103-04.) The Pyramid's interior houses the Ducks Unlimited Waterfowling Heritage Center, a 4,600 square-foot museum that has drawn over 500,000 visitors since its opening in 2014. (Id.)

Ducks Unlimited frequently encounters unauthorized use of the DU Logo in the marketplace. (ECF No. 153 at 84-85.) Barnes, nicknamed the "logo police," testified that, when he discovers someone selling the DU Logo on a third-party retail website like eBay or Etsy, he usually sends a short message warning the person to stop. (Id. at 62, 84-85.) Barnes explained that he would warn a member at a tradeshow selling DU Logo-branded merchandise to stop because only licensees are authorized to sell branded merchandise. (Id. at 86.) When Barnes encounters someone using the DU Logo without authorization in a more coordinated branding fashion, he reports that use to Ducks Unlimited's legal team. (Id. at 85.) The legal team, which polices both individuals and companies, routinely sends cease and desist letters to, or files lawsuits against, unauthorized users. (Id. at 47-48; Tr. Ex. No. 87 at 16-21, 55.)

Ducks Unlimited does permit one-off uses of the DU Logo for personal use by special request, such as for use on tombstones, tattoos, or custom-made jewelry. (ECF No. 153 at 83-84.) Such custom-made products are not authorized for resale, and merchants may not make additional products using the DU Logo beyond what Ducks Unlimited expressly authorizes. (Id. at 84.) When people make personal requests, they generally do not ask for permission to use the DU Logo in combination with the words "Ducks Unlimited" or other letters (i.e. the Combination DU Logo). (Id.) Instead, as Barnes testified, "[t]hey want to see that Duckhead." (Id.)

### 2. Boondux's Use of the Boondux Logo

Boondux, LLC is a for-profit company started by Sutton in June 2012. (ECF No. 153 at 219; ECF No. 154 at 29.) Sutton is the sole owner, member, and paid employee of Boondux. (ECF No. 153 at 219.)[4] Boondux sells merchandise branded with the Boondux Logo, and it is the only company that sells Boondux-branded products to the consuming public. (ECF No. 154 at 28-29.) Before Boondux was a registered LLC, Sutton personally sold Boondux-branded products. (Id.)

Boondux sells decals, apparel, and other accessories that bear the Boondux Logo. Boondux has sold over 10,000 decals,

---

[4] Sutton's mother serves as an unofficial or unpaid employee of the company. (ECF No. 154 at 109-10.)

generating over $160,000 in gross revenues for that product.
(ECF No. 154 at 223-25; Tr. Ex. No. 71 (sales records).)
Boondux decals depict the Boondux Logo without displaying any
lettering or the name "Boondux." (ECF No. 153 at 229, 233; Tr.
Ex. Nos. 61, 62 (decals).) They are priced between $10 and $20.
(ECF No. 153 at 232.) Boondux sells a variety of shirts and
hats that range in price from $22 to $35. (Id. at 236-38, 242,
245; ECF No. 154 at 8-10; Tr. Ex. Nos. 63 (t-shirt), 64 (product
photos), 65 (product photos), 66 (hat), 67 (hat).) On apparel
items, sometimes the name "Boondux" appears beneath the Boondux
Logo; sometimes the company name appears elsewhere on the
product. (ECF No. 153 at 248; See Tr. Ex. No. 64.) Other
accessories featuring the Boondux Logo include keychains,
sunglass straps, can koozies, and snuff skins, each of which
depicts the Boondux Logo and is priced between $4 and $12. (ECF
No. 154 at 11-13; Tr. Ex. No. 68 (keychain).) Boondux stamps
the Boondux Logo on the packaging used to ship products to
customers. (ECF No. 154 at 213-14; Tr. Ex. No. 94 (packaging).)
Boondux also sells duck calls. (ECF No. 154 at 14-15.) Most
duck calls display a left-facing version of the Boondux Logo
(the "Signature Boondux Logo"), depicted below:



(Id. at 16; Tr. Ex. No. 69 (duck call).)

Boondux's target consumers include people who like to hunt and fish and sportsmen generally. (ECF No. 154 at 17.) Boondux has sold products in all 50 states and Canada, but its primary sales base is Louisiana, Mississippi, Alabama, Texas, Florida, Georgia, the Carolinas, Arkansas, and Tennessee. (Id. at 17-18.)

Boondux advertises its products on social media through Facebook, Instagram, and Twitter. (ECF No. 153 at 226-27.) Boondux pays for advertisements on Instagram, which is Boondux's primary advertising platform. (Id. at 227.) Boondux's profile picture on Facebook depicts the Boondux Logo with the name "Boondux" underneath; its profile pictures on Instagram and Twitter depict the Boondux Logo standing alone. (Id.; Tr. Ex. Nos. 58 (Facebook), 59 (Instagram), 60 (Facebook).)

Boondux primarily sells its products through its website, www.boondux.com. (ECF No. 153 at 220-21; Tr. Ex. No. 57 (website screenshot).) The website's homepage displays the Boondux Logo next to the name "Boondux" in the upper-left corner

of the page, and displays several products for sale featuring the Boondux Logo. (See Tr. Ex. No. 57.) The name "Boondux" can be seen elsewhere on the website. (Id.) The website does not have a link to an "About Us" page that might provide any information about Boondux or who owns the website. (ECF No. 153 at 223.) Sutton testified that "someone can draw their own conclusions on who Boondux is; but we don't have a, you know, a written-out letter per se that says this is who we are." (Id.)

Boondux has also sold products at tradeshows in Louisiana, Texas, Mississippi, Alabama, and Tennessee. (ECF No. 154 at 20-21.) In 2014 and 2015, Boondux sold products at both the Louisiana Sportsman Show and the Mississippi Wildlife Extravaganza. (Id.) At tradeshows, above the product-display area, Boondux typically hangs several large banners that show the Boondux Logo with the name "Boondux" and the Boondux website URL underneath. (Id. at 200-03; Tr. Ex. No. 93.)

Except for sales at Tradeshows, Boondux products are currently offered exclusively online. (See Tr. Ex. No. 70 (retailers webpage).) Sutton testified that it is "very possible" that Boondux might expand into brick-and-mortar retail stores. (ECF No. 154 at 21.) Retailers have approached him asking to carry the Boondux brand. (Id. at 26.) Boondux's website has a "Retailers" webpage that reads:

If you would like to see Boondux in a store near you,
ask for us at your favorite local retailer!

At the current time we do not have a projected date
when we will release our line to retailers. If you
would be interested in carrying Boondux at your store
in the future, or would like to suggest a retailer for
us to consider, please contact us by emailing
Retailers@boondux.com.

When we are ready to offer our product line to
retailers you will be contacted First!

(Tr. Ex. No. 70.) Sutton testified about the various logistical
considerations that factor into a decision to expand into store-
front retail. (ECF No. 154 at 107-09.) At trial, Sutton agreed
that he had previously testified in his deposition that his
current lack of interest in retail is "due to mainly the
litigation" in this case. (Id. at 22-23.)

### 3. Logo Similarities and Differences

#### a. Barnes's Testimony

As Creative Director for Ducks Unlimited, Doug Barnes has
worked with the DU Logo for almost 20 years. (ECF No. 153 at
95-96.) Barnes testified about how he first saw the Boondux
Logo in public. (Id. at 87-88.) He explained that he was
driving home from work when he noticed ahead, about four or five
cars away, a logo on the back window of a pickup truck. (Id.)
At first, Barnes thought it was the DU Logo, but he observed
that it was bigger than the DU Logos he normally sees on pickup

trucks.  (Id. at 88.)  Barnes described how he came to realize
that the logo ahead was the Boondux Logo:

> So, my first response was, because I always am
> watching out for the [DU Logo], I didn't know we sold
> a 10-inch tall or 12-inch tall logo.  So, I was
> interested in that and I kind of pushed my way up to
> the front where I could get a good look at it and when
> I got about one car away, I realized that it wasn't,
> you know, that it wasn't our logo, that just at a
> distance I thought it was and then realized that it
> was the one that I had been told about.

(Id.)  Barnes wondered whether the creator of the logo he saw
had traced or scanned the DU Logo or whether "in some way they
had gotten [Barnes's] file and had subtly changed it."  (Id.)

The next day at work, Barnes downloaded the Boondux Logo --
the logo he had seen -- from Boondux's website and created an
overlay using the Boondux Logo and the DU Logo.  (Id. at 91.)
Using Photoshop on his computer to see how the two logos
compared, Barnes laid the Boondux Logo over the DU Logo, using
two different colors for contrast, and then laid the DU Logo
over the Boondux Logo, both of which are depicted below:



*Figure B. Overlay Comparison*

*Ducks Unlimited logo Below*          *BoonDux logo Below*

(<u>Id.</u> at 93-95; Tr. Ex. No. 50 (logos overlay).) Despite his experience in marketing and logo design generally and in tailoring the DU Logo for use at Ducks Unlimited events, Barnes testified that he has never successfully sketched the DU Logo in any usable form. (ECF No. 153 at 59, 95.)

> **b. Williams's Testimony**

Plaintiff offered Richard Williams, an Associate Creative Director at Archer Malmo, to give his opinion about the similarities and differences between the DU Logo and the Boondux Logo. (ECF No. 154 at 124-25, 127.) At Archer Malmo, Williams has worked on branding and messaging campaigns for many clients. (<u>Id.</u> at 125-26.) For over 20 years, Williams has designed hundreds of logos. (<u>Id.</u> at 126.)

Williams described the similarities he observed between the two logos:

> [T]he curvature of the head to the crown of the head,
> the length of the beak, the curvature underneath the
> neck are all similar.  They follow the same paths.
> They have the same weight of importance.  You know, to
> me, you know, whether intentionally or unintentionally
> it's a direct copy.  You know, the Boondux logo is a
> direct copy to me of the Ducks Unlimited logo.

(Id. at 128.)  Williams testified that the logo overlay that

Barnes had created was useful to him in forming his opinion.

(Id. at 129.)  He explained: "It really defined how, you know,

they both occupy the same space.  The curvature's the same.  All

the elements are virtually the same."  (Id.)  Williams also

testified about a side-by-side comparison he created and used in

comparing the logos:



*Figure A. Side-by-side Comparison*

*Ducks Unlimited logo*          *BoonDux logo*

(Id. at 129-30; Tr. Ex. No. 85 (diagram).)  Williams explained

that his diagram "allows you to spatially kind of get a measure

for how these two logos fit within the same space."  (ECF No.

154 at 130.)  Williams opined: "They occupy the same curve.  The

position of the beak is in the same position. The length of the beak, it's the same length." (Id.) Williams added: "[I]t's almost as if somebody had traced the logo and created the Boondux logo from the Ducks Unlimited logo." (Id. at 131.)

Addressing the differences between the logos, Williams characterized the Boondux Logo's hook and antler features as "decoration." (Id. at 129.) When asked by Defendants' counsel about the fact that the Boondux Logo's neckline extends below the termination point of the DU Logo's neckline, Williams opined on the significance of that detail: "It would be like me creating a new Swoosh logo for Nike and instead of stopping it where Nike stops it, I just kind of extend it out . . . and make it longer and that's all that's done." (Id. at 146-47.) Despite the differences between the two logos, Williams opined: "To me, the shape of the duck head is the key here; and, you know, looking at it, the way they almost mirror each other is pretty outstanding." (Id. at 129.)

Williams discussed a sampling that he compiled in his expert report of duck-themed logos used by other brands. (Id. at 134-39; Tr. Ex. No. 86 (third-party duck logos).) Williams explained that his compilation showed that "various companies seem to be very successful at living within the same space but also looking completely different from one another, looking completely different from Ducks Unlimited." (ECF No. 154 at

135.)  Despite the contrasts between other brands' duck logos and the DU Logo, Williams opined that the Boondux Logo does not differ from the DU Logo with respect to, among other features, direction, pose, or style of drawing.  (Id. at 139.)  When asked what he would say if a designer at his firm tasked with designing a duck logo were to bring him the Boondux Logo, Williams answered:

> I would say, you know, that it looks like somebody -- you're trying to copy the Ducks Unlimited logo. That's a pretty neat idea to use a hook and an antler. Go make something else with it; or if you're wanting to create a duck, create a different duck.  There are millions of ducks, you know.

(Id. at 133.)

### c.   Breaux's Testimony

Defendants offered Marie Breaux, an intellectual property lawyer with experience in copyright and trademark law, *inter alia*, to give her opinion on the similarities and differences between the DU Logo and the Boondux Logo.  (ECF No. 155 at 61, 66.)  Although Breaux had not filed a copyright application for the Boondux Logo on behalf of Sutton, she discussed the salient facts that would bear on whether a design like the Boondux Logo might be cleared by the USPTO for copyright registration purposes.  (Id. at 72-73; see Tr. Ex. No. 101 (expert report).)

In addressing the similarities between the DU Logo and the Boondux Logo, Breaux discussed a diagram she had created that

depicts each logo superimposed over a duck silhouette -- what
she described as the "archetypal form of a duck" -- provided by
the Cornell Ornithological Laboratory, a leading authority on
birds:



Boondux

DU duck head

(ECF No. 155 at 83; Tr. Ex. No. 101 at 14.)  Breaux opined that,
as illustrated by her diagram, both the DU Logo and the Boondux
Logo reflect the general shape of a duck's head with respect to
"the proportions, the shape, [and] what is depicted there."
(ECF No. 155 at 84.)  Breaux conceded, however, that there are
many ways to make a line drawing of a mallard's head in right-

facing profile and that any such drawing need not have the same shape and the same head and neck curves as the DU Logo. (ECF No. 156 at 60.)

Addressing the differences between the logos, Breaux highlighted the "different artistic choices" made by the authors of the respective works. (ECF No. 155 at 88.) Those differences include, among other details, the difference in overall style between the logos, the use of continuous versus discontinuous lines, the shape of eye and beak elements in each logo, the shape of the neck in each, and the presence or absence of a nostril element. (Id.; see Tr. Ex. No. 101 at 16.) Although a legal conclusion, Breaux opined that the DU Logo and the Boondux Logo are not "substantially similar" for copyright purposes. (ECF No. 155 at 88-89.)[5]

### 4. Actual-Confusion Evidence

Plaintiff presented some anecdotal evidence of actual confusion for purposes of its trademark and false designation claims, but that evidence was minimal. Barnes testified the he personally has "had people call [him] about [the Boondux Logo] on a pretty regular basis." (ECF No. 153 at 96.) He has

---

[5] Although Breaux was given latitude to testify about a variety of considerations she found pertinent in assessing the copyright and trademark clearance potential of the Boondux Logo, much of her testimony consisted of legal conclusions rather than factual evidence. The Court does not rely on Breaux's legal conclusions.

fielded phone calls from about 25 people asking such questions as: "Do you know about it?  Have you seen it?  And are you going to allow it to continue?"  (Id. at 97.)

Sutton admitted that on more than one occasion people have seen the Boondux Logo and "mentally associated" and said that they made "some connection" between the Boondux Logo and the DU Logo.  (ECF No. 154 at 48.)  Sutton also admitted that he has personally encountered people who asked aloud when looking at the Boondux Logo, "Oh, is that Ducks Unlimited?"  (Id. at 49.) Sutton clarified that fewer than 10 people had done so.  (Id.)

Plaintiff's primary actual-confusion evidence was a likelihood-of-confusion survey conducted by Hal Poret, owner of a survey research and consulting business.  (ECF No. 153 at 134-35.)  Poret has conducted over 1,000 consumer surveys, including about 200 likelihood-of-confusion surveys, testifying as an expert about the latter in 15 trials.  (Id.)

Poret designed an online Eveready survey to test whether consumers seeing a Boondux product that includes the Boondux Logo in a retail-store environment would be confused by mistakenly thinking that the product comes from Ducks Unlimited or is otherwise affiliated with or approved by Ducks Unlimited. (Id. at 136-37.)  Poret's online survey, conducted in May 2016, drew from a Research Now database pool of about 4 to 5 million Americans and specifically targeted people who self-identified

as interested in hunting, fishing, and other outdoor activities and who answered that they were likely to purchase apparel items from an outdoor-goods store like Bass Pro Shops or Cabela's. (Id. at 137-141.)

Two-hundred survey respondents formed the Test Group and were shown pictures of Boondux apparel items taken from Boondux's website. (Id. at 149, 174, 209-10.) The Test Group pictures depicted a Boondux hat or t-shirt, each displaying the Boondux Logo as well as brand identification such as the name "Boondux" and the product tag:



(Id. at 149-150; Tr. Ex. No. 54 (Test Group Photos).) Poret testified that he selected images that would fairly simulate a consumer encounter with a hat or shirt in a retail-store environment. (ECF No. 153 at 150-51.) One-hundred survey respondents formed the Control Group and were shown pictures depicting a hat or t-shirt, each displaying the Drake Logo and the name "Drake" as brand identification:



(ECF No. 153 at 158-60; Tr. Ex. No. 55 (Control Group Photos).)

Poret explained why he chose the Drake Logo as his control image:

> I wanted to have a logo that is a Duckhead but has somewhat of a different shape and design so that it would be a fair test of: When I show somebody something with a Duckhead logo that is not confusingly similar to Ducks Unlimited, will the survey for whatever reason cause people to name Ducks Unlimited in a way that really shouldn't be counted? So, this logo being a Duckhead but not confusingly similar to the Ducks Unlimited logo makes it a perfect control.

(ECF No. 153 at 159.)

After viewing the product images, survey respondents in both groups were asked whether they had a belief about which company, organization, or brand made or put out the product and, if so, to identify the company, organization, or brand. (Id. at 151-53, 159; Tr. Ex. No. 53 (survey appendix).) Respondents were also asked whether they thought the product was affiliated with, sponsored by, or approved by any company, organization, or brand and, if so, to identify that company, organization, or brand. (ECF No. 153 at 155-56, 159; Tr. Ex. No. 53.) The only

difference between the Test Group and the Control Group was whether respondents were shown products displaying the Boondux Logo or products displaying the Drake Logo. (ECF No. 153 at 160.) At no point were any respondents shown the DU Logo, and Ducks Unlimited was not mentioned in the survey. (Id. at 136-37.) Poret explained that that design feature, typical of Eveready surveys, made the survey "very conservative" because the only people who might name "Ducks Unlimited" in response to the questions, and thereby express confusion, were those who already knew the DU Logo well and who thought of it on their own. (Id. at 136-37, 166-67.)

Poret's survey results showed that 16.5% of survey respondents in the Test Group answered that they thought the Boondux Logo-branded products were made by, affiliated with, or approved by Ducks Unlimited. (Id. at 163; Tr. Ex. No. 56 (survey results chart).) About 23% of Test Group respondents who identified as those who hunt identified Ducks Unlimited with the Boondux products. (ECF No. 153 at 175.) In contrast, 3% of survey respondents in the Control Group who viewed the Drake Logo-branded products identified Ducks Unlimited with those products. (Id. at 163; Tr. Ex. No. 56.) The net confusion rate, calculated by subtracting the Control Group confusion percentage from the Test Group confusion percentage, was 13.5%. (ECF No. 153 at 163-64; Tr. Ex. No. 56.) Poret opined that the

survey results show that "there's a statistically meaningful pattern of confusion in the form of people thinking that Boondux items are from Ducks Unlimited or otherwise connected to Ducks Unlimited because of the similarity of the Duckhead logo." (ECF No. 153 at 165-66.)  Poret's survey did not test for confusion in the context of product sales on Boondux's website, and he declined to express an opinion about that context.  (Id. at 216-17.)

The Court does not give weight to Poret's survey.  First, Poret did not adequately explain why the Drake Logo-branded products were appropriate products to use for the Control Group. Poret discussed why a control group is necessary in a survey in which test group respondents are shown products with an allegedly-infringing logo, such as the Boondux Logo, and are asked to identify the source of the product.  (Id. at 157-58.) Poret explained: "[T]he concern you have in a survey is: Is this logo really confusingly similar with Ducks Unlimited; or is it simply that whenever somebody sees a duck logo, they're going to think of Ducks Unlimited and say that?"  (Id. at 158.)  Poret explained that the Drake Logo was a "perfect control" image because, in his opinion, it "look[s] like a duck head."  (Id. at 159, 203-04.)

The Drake Logo does not readily look like a duck head.  The Court was unable to perceive the appearance of a duck head when

viewing the Drake Logo during Poret's direct examination.[6]  As a duck-head logo, the Drake Logo is highly stylized.  Poret discussed the various quality control measures he took and the filtering questions he asked to ensure that he obtained reliable data.  (See, e.g. id. at 146-48, 152, 155.)  None of Poret's survey questions, however, ensured that respondents perceived a duck head when they viewed the Drake Logo.  (See generally Tr. Ex. No. 53.)  For example, before asking what company, organization, or brand, if any, respondents identified with the logos they were shown, Poret's survey could have asked, "What if anything does the logo you saw depict?"  Although Poret opined that the Drake Logo looks like a duck head, his survey did not assess whether Control Group respondents unfamiliar with the Drake Logo also thought so.  Respondents might well have perceived it as a stylized ocean wave or an abstract design. Poret's Control Group design did not reliably mitigate the possibility of false positives with respect to the Boondux Logo by guarding against the possibility that "whenever somebody sees a duck logo, they're going to think of Ducks Unlimited and say that."  (ECF No. 153 at 158.)

---

[6] In ruling on the admissibility of Poret's testimony pre-trial, the Court did not consider the Control Group images. Defendants' objections to Poret's testimony were based on relevance, not reliability, and the Court addressed those objections specifically.  (See ECF No. 140 at 9-13.)

Second, Poret did not adequately explain whether the Drake Logo was an appropriate control image based on its strength or brand recognition among the consuming public. Roberts of Artisans testified that Ducks Unlimited-branded apparel competes with Drake among other companies, such as Nike, Columbia, and Under Armour. (Id. at 25.) When discussing the results of his survey, Poret did not address what percentage of Control Group respondents correctly identified Drake Waterfowl Systems as the company associated with the Drake Logo. One of Poret's survey questions, Question 320, asked, "For each company, brand, or organization you just named, please explain what makes you think that the cap [or t-shirt] you just saw is made or put out by that company, organization, or brand." (Tr. Ex. No. 53 at Q320.) Poret did not discuss what if anything respondents' answers to Question 320 revealed. Some Control Group respondents who correctly identified Drake Waterfowl Systems might have explained that they answered as they did because they were already familiar with the Drake brand. Such respondents presumably would avoid mistakenly identifying Ducks Unlimited with the Drake Logo.

Taken together, it is possible that many Control Group respondents either did not recognize that the Drake Logo depicted a duck head or correctly recognized the company associated with the Drake Logo because they were already

familiar with the brand.  Given those possibilities, Poret's findings failed to rule out the possibility that someone unfamiliar with the Boondux brand might mistakenly identify Ducks Unlimited with the Boondux Logo simply because the Boondux Logo looks like a duck head rather than because it is confusingly similar to the DU Logo.  Because the Court is not persuaded that the Control Group questions were properly designed, the Court cannot rely on Poret's survey.

### 4.    Sutton's Creation of the Boondux Logo

Sutton testified about how he created the Boondux Logo.  He explained that his "goal was to create something that was completely unique and different from the market or just from designs in general and just kind of create an original design." (ECF No. 154 at 106-07.)  He began creating his logo one day in January 2012 during his high school religion class.  (Id. at 74, 107, 174.)  Sutton explained that he was drawing sketches using the elements of a hook, antler, and feather after having been inspired by a logo he had seen that incorporated those elements. (Id. at 59-60, 106.)  After sketching several drawings that combined a hook, antler, and feather in different ways, Sutton noticed that one of them looked like a duck head.  (Id. at 59-60; Tr. Ex. No. 74 at CS&B-000223 to -000225 (drawings).)  One of those drawings was the following:



(Tr. Ex. No. 74 at CS&B-000225.)

Sutton testified that shortly afterward, on the weekend, rather than go hunting with his father, Sutton stayed home and continued refining his drawing. (ECF No. 154 at 60.) Sutton explained that he worked on his drawing all day, asking his mother and aunt, Amy Sutton, for advice and bouncing ideas off of them. (Id. at 171.) Sutton testified that further drafting led to the following drawing:



(Id. at 60-61; Tr. Ex. No. 74 at CS&B-000228.) Sutton testified that his mother suggested that he extend the antler out to help form a beak and move the hook's barb up. (ECF No. 154 at 95-97.) Sutton explained that he followed his mother's suggestions, partially modifying his drawing by sketching the faint lines, in the drawing above, that appear at the bottom and

39

back of the beak and near where the top of the beak meets the bold lines of the hook's barb. (See id. at 96-97; see also id. at 102-04; Tr. Ex. No. 81 (courtroom drawing).) Sutton testified that the above drawing was the last hand drawing of his logo before he completed the logo on his computer. (ECF No. 154 at 61-62, 78, 86.)

Sutton testified that he took the above drawing, taped the piece of paper to his computer screen, and, using an AutoCAD program, traced the lines using his computer mouse by viewing the cursor on the screen through the paper. (ECF No. 154 at 63, 97-98.) Sutton explained that, after making a couple of revisions, such as lengthening the hook and changing the barb, he produced the following image:



(Id. at 62, 78, 97; Tr. Ex. No. 74 at CS&B-000260 to -000261.)[7] Sutton testified that, in his opinion, his final hand drawing and his AutoCAD drawing have the same shape. (ECF No. 154 at 64.)

---

[7] Defendants contend that a different image was the first image Sutton created using the AutoCAD program. (ECF No. 159 at 13-14; see Tr. Ex. No. 74 at CS&B-000259.) That contention is not supported by the trial testimony. (See ECF No. 154 at 58-59.)

Sutton admitted that he was familiar with the DU Logo. Sutton had seen the DU Logo on t-shirts, decals, coolers, duck calls, hats, belts, keychains, on merchandise at Cabela's while shopping, on his friend's decoy bag during a hunting trip, and on Ducks Unlimited pop-up advertisements on Facebook. (Id. at 47-48.) Sutton himself is a deer hunter and had been duck hunting at least once before. (Id. at 73.) Sutton said that he was aware that one of his friends has a license plate that displays the DU Logo and that another friend has a dog collar displaying the logo. (Id. at 47.)

People close to Sutton are also familiar with the DU Logo. Sutton's former religion teacher, Michael Manning, was familiar with the DU Logo from having seen it among the hunting- and fishing-themed decals on trucks in the parking lot of the all-boys school that Sutton attended. (Tr. Ex. No. 89 at 8, 14-16 (Manning deposition).) Manning remembers seeing hunting/fishing-themed decals in the parking lot since as early as 2009. (Id. at 15-16.) Manning testified that he had "no idea what [Ducks Unlimited] does, how it works, [or] anything like that," but he recognized the DU Logo. (Id. at 18.) Sutton's friend and former high school classmate, Corey Free, had seen the DU Logo on automotive decals, a license plate, t-shirts worn by others, hats, and on merchandise sold at Bass Pro Shops and Cabela's. (Tr. Ex. No. 90 at 7, 19-20 (Free

deposition).) Free had owned a Ducks Unlimited-branded dog collar since 2009. (Id. at 22.) Free considered Sutton to be someone with a "real interest in hunting and fishing." (Id. at 15.) Sutton's aunt, Amy Sutton, who was with Sutton the weekend he created his logo, testified that she recognized the DU Logo and that Ducks Unlimited had been in her "atmosphere as far back" as she could recall. (Tr. Ex. No. 88 at 28-29 (A. Sutton deposition).) Over 20 years ago, she worked as a "Ducks Unlimited girl" at two Ducks Unlimited events. (Id. at 30.)

Although Sutton had seen the DU Logo before this litigation, he testified that he could not recall when he first saw it. (ECF No. 154 at 46.) Sutton agreed that it was "very possible" that there were a lot of hunting-themed decals on trucks in his high school parking lot around the time he designed the Boondux Logo in January 2012. (Id.) Sutton maintained, however, that he did not have the DU Logo available to him as he worked on his Boondux Logo and that he did not copy it. (Id. at 172-73, 222.)

Sutton's testimony is not credible. First, that Sutton was immersed in a hunting, fishing, and outdoorsman culture is evident from his testimony and the testimony of those near him. Ducks Unlimited has strong brand presence in that culture and has a strong organizational presence in Baton Rouge and Louisiana generally. Although Sutton did not say when he

recalls having first seen the DU Logo, the evidence supports the reasonable inference that Sutton was familiar with the DU Logo before he designed the Boondux Logo.

Second, although Sutton's testimony was detailed and specific about a number of the sources that inspired his creation, his testimony about duck-specific sources was vague and difficult to credit. Sutton described the bouquet-shaped "Hooks Horns & Feathers" logo that inspired his initial drawings and explained that, while working on his logo, at one point he walked over and looked at the deer antlers on a deer head hanging above the fireplace "to get a better representation of the deer antlers." (Id. at 106, 172.) As shown by one exchange between Plaintiff's counsel and Sutton at trial, however, Sutton's recall of duck-specific sources of inspiration was much more imprecise:

> Counsel: Okay. So, once you committed to the idea of using the antler and the hook to form a duck head, did -- you didn't look at photos of ducks or an encyclopedia or Google duck images or anything like that, did you?
>
> Sutton: I think I did look at, like, pictures of ducks in nature.
>
> Counsel: What did you look at?
>
> Sutton: I believe it was just pictures of ducks in nature.
>
> Counsel: Where did you find those pictures?
>
> Sutton: Probably on the Internet.

```
Counsel:   Did  you  produce  any  of  that  material  in
           response  to  the  discovery  request  in  this
           case?

Sutton:    No, ma'am.

Counsel:   So,  you  think  you  might  have  looked  at
           pictures of ducks on the Internet?

Sutton:    It's very possible, yes, ma'am.

Counsel:   It's possible, but you don't know for sure.

Sutton:    I think I did look at pictures of the ducks
           on the Internet.

Counsel:   Where did you find the pictures?

Sutton:    On the Internet.

Counsel:   Where on the Internet?

Sutton:    Not sure.

Counsel:   You don't know.

Sutton:    No, ma'am.

Counsel:   You  just  Googled  duck  pictures  on  the
           Internet and --

Sutton:    I can't recall what exactly I Googled.
```

(Id. at 74-75.)  Sutton also was not consistent about what kind
of duck the Boondux Logo depicts or is intended to depict.  In
the proposed Pretrial Order that the parties submitted, which
the Court adopted, Sutton agreed that the Boondux Logo forms the
shape of a mallard's head.  But when asked by Plaintiff's
counsel what breed of duck the Boondux Logo looks like, Sutton

answered, "Um, I'd like to say a mix between a wood duck and a pintail." (Id. at 75.)

Third, and most significantly, even were the Court to fully credit Sutton's testimony describing the process by which he created the Boondux Logo, critical differences between Sutton's final hand drawing and his AutoCAD design preclude the possibility that Sutton created the Boondux Logo without relying on the DU Logo. The Court does not agree with Sutton's opinion that his final hand drawing has the same shape as his AutoCAD design. Sutton testified that he traced his hand drawing on his computer, but the antler and beak elements of his hand-drawing design and his AutoCAD design are significantly different. Even were the Court to accept that Sutton traced the faint beak lines of his drawing rather than the bold ones, the faint lines also do not resemble the shape of the AutoCAD design's beak element. The differences between the two designs ostensibly are explained by Sutton's testimony that he made further revisions to his design while using his AutoCAD program. That testimony, however, does not adequately explain how Sutton achieved a final logo shape that so closely tracks the shape of the DU Logo, as illustrated by Barnes's and Williams's testimony. Because, inter alia, the gap between Sutton's final hand drawing and his AutoCAD design is so great, Sutton's testimony about how he

created the Boondux Logo is implausible.  The Court gives that testimony little weight.

## IV.  CONCLUSIONS OF LAW

### A.  Copyright Infringement Claim

#### 1.  General Legal Standards

Plaintiff's copyright infringement claim arises under the Copyright Act, 17 U.S.C. § 501.  "Title 17 of the United States Code protects owners' copyrights in creative works."  Murray Hill Publ'ns., Inc. v. Twentieth Century Fox Film Corp., 361 F.3d 312, 316 (6th Cir. 2004).  "Copyright owners have the exclusive right to reproduce the protected work, to prepare derivative works, and to distribute copies to the public."  Id. (citing 17 U.S.C. § 106(1)-(3)).

"To establish copyright infringement, a plaintiff must show: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  Ellis v. Diffie, 177 F.3d 503, 506 (6th Cir. 1999) (quotation marks omitted).  "Direct evidence of copying is rare, so frequently the plaintiff will attempt to establish an inference of copying by showing (1) access to the allegedly-infringed work by the defendant(s) and (2) a substantial similarity between the two works at issue."  Id.

"Access is proven when the plaintiff shows that the defendant had an opportunity to view or to copy plaintiff's

work." Murray Hill, 361 F.3d at 316 (quotation marks omitted). "[A]ccess may not be inferred through mere speculation or conjecture." Ellis, 177 F.3d at 506 (quotation marks omitted). "A mere assertion of access, unsupported by probative evidence[,] is inadequate." Murray Hill, 361 F.3d at 316 (quotation marks omitted). Instead, a "plaintiff must establish that defendant(s) had a reasonable possibility to view plaintiff's work." Id. (quotation marks omitted).

In addition to access, a plaintiff must prove substantial similarity between the two works. "Similarity is determined by a comparison of plaintiff's and defendants' works." Wickham v. Knoxville Int'l Energy Exposition, Inc., 739 F.2d 1094, 1097 (6th Cir. 1984). Before comparing similarities between the two works, the court must "identify[] which aspects of the artist's work, if any, are protectible by copyright." Kohus v. Mariol, 328 F.3d 848, 855 (6th Cir. 2003) (quotation marks omitted). The court must then "determin[e] whether the allegedly infringing work is substantially similar to protectible elements of the artist's work." Id. (quotation marks omitted).

The first step of the substantial-similarity analysis involves "filter[ing] out the unoriginal, unprotectible elements -- elements that were not independently created by the inventor, and that possess no minimal degree of creativity." Id. "[C]opyright protection extends only to expression of ideas and

not to ideas themselves." Stromback v. New Line Cinema, 384 F.3d 283, 296 (6th Cir. 2004). An "expression" is that which "display[s] the stamp of the author's originality." Id.

"Once the unprotectible elements have been filtered out, the second step is to determine whether the allegedly infringing work is substantially similar to the protectible elements of the original." Kohus, 328 F.3d at 856 (6th Cir. 2003). This step requires a comparison of the two works. Stromback, 384 F.3d at 297. In doing so, the question is "whether the two works are, taken as a whole, substantially similar in look and feel to a jury." Murray Hill, 361 F.3d at 318. "Substantial similarity exists where the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value." Stromback, 384 F.3d at 297 (quotation marks omitted). "The misappropriation of even a small portion of a copyrighted work may constitute an infringement under certain circumstances." Murray Hill, 361 F.3d at 320 (quotation marks omitted). "Even if a copied portion be relatively small in proportion to the entire work, if qualitatively important, the finder of fact may properly find substantial similarity." Id. (quotation marks omitted).

"Once a plaintiff establishes access and substantial similarity, the defendant may rebut the presumption of copying by showing independent creation of the allegedly infringing work."  Fogerty v. MGM Grp. Holdings Corp., 379 F.3d 348, 352 (6th Cir. 2004).  "[D]etailed and specific evidence of independent creation" may overcome an implicit suggestion of copying produced by the plaintiff's proof.  See Ellis, 177 F.3d at 507.

### 2.  Analysis

Defendants concede that Ducks Unlimited owns a valid copyright in the DU Logo.  At issue is whether Defendants unlawfully copied the DU Logo in their creation and use of the Boondux Logo.

### a.  Access

Ample evidence of access shows that Sutton had an opportunity to view the DU Logo before he designed the Boondux Logo.  First, the Court concludes, based on Sutton's testimony, that Sutton did, in fact, have the DU Logo available to him and relied on it as he designed the Boondux Logo.  Although Sutton denied those facts, as discussed above, the Court does not find Sutton's denial credible.  Sutton's narrative about how he independently created the Boondux Logo is implausible because, *inter alia*, his final hand drawing, which Sutton testified he traced on his computer, does not match the AutoCAD design that

Sutton produced. The Court does not agree with Sutton's opinion that his final hand drawing and his AutoCAD design are the same shape. Sutton testified that he further revised his design on the computer after tracing the hand drawing, but the act of revision alone does not persuasively account for the close similarity in shape between the Boondux Logo and the DU Logo. Such a claim of coincidence is not compelling, especially given that Sutton's testimony was not clear and consistent about key aspects of his logo-creation narrative.

Other evidence also shows that Sutton had an opportunity to view the DU Logo before designing the Boondux Logo. Ducks Unlimited has substantial brand presence nationally and in Sutton's home state of Louisiana. Access may be found "if plaintiff's work has been widely disseminated, as by extensive publication." 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.02[A] (rev. ed. 2017). Of Ducks Unlimited's 2,800 chapters and 600,000 members nationwide, 64 chapters with 20,000 members are in Louisiana. Two chapters in Sutton's hometown of Baton Rouge have been established since 1985, one of which has a member base of 900 people, and the other draws 500 attendees to its annual event. Those figures have not appreciably changed since January 2012. Ducks Unlimited has also placed the DU Logo on many consumer goods that are available to both Ducks Unlimited members and the consuming

public.  Although Plaintiff did not produce evidence of specific sales figures for DU Logo-branded merchandise in Baton Rouge or Louisiana, it is reasonable to infer that product sales in both places are substantial given the critical mass of chapters and members in both locations.  Ducks Unlimited and its DU Logo are also visible on the Internet through Ducks Unlimited's website and on various social media platforms -- media that Sutton has used personally.

Whether through membership or through product sales, Ducks Unlimited targets the hunting, fishing, and outdoorsman culture, in which Sutton and a number of his friends are active participants.  Sutton and those near him are familiar with the DU Logo, having seen it on a variety of products -- such as decals, license plates, apparel items, and hunting goods -- and in a variety of settings, ranging from Sutton's own hunting outings and shopping trips to the parking lot at his former high school.  Sutton's aunt testified that Ducks Unlimited has been a part of her life experience as far back as she can remember.

Defendants argue that the evidence of Sutton's access to the DU Logo before he designed the Boondux Logo is "mere speculation or conjecture."  For example, although Sutton admitted that it was "very possible" there were many hunting-themed decals on trucks in his high school parking lot around the time he designed the Boondux Logo (Sutton's religion teacher

confirmed the presence of such decals as early as 2009), Defendants contend there is no evidence that the DU Logo was necessarily one of them. (ECF No. 161 at 16-17.) Defendants also argue that others' knowledge of the DU Logo, such as Sutton's friends or his former religion teacher, should not be "imparted" to Sutton without evidence that those people "have the same life experience and exposure to trademarks" as Sutton. (Id. at 17.) Defendants discount Sutton's hunting experience on the ground that Sutton is not a regular duck hunter. (Id.) Defendants argue, "Ducks Unlimited was able to establish that [Sutton] was aware of the [DU Logo] at the time of trial; it did not prove that Mr. Sutton was aware prior to his creation of the Boondux Mark." (Id. at 16.)

For access purposes, the test is not whether the defendant was *actually aware* of the plaintiff's work at the time the defendant created the allegedly infringing work. Rather, the test is whether the defendant had a "*reasonable possibility* to view plaintiff's work." Murray Hill, 361 F.3d at 316 (emphasis added). The Court's conclusion, based in part on Sutton's testimony, that Sutton, in fact, relied on the DU Logo while creating the Boondux Logo obviates the need to rely on additional access evidence. Notwithstanding that conclusion, the additional access evidence presented shows that Sutton at least had a reasonable possibility to view the DU Logo before

January 2012. Sutton did not deny having seen the DU Logo before then. Defendants do not plausibly suggest that, before 2012, there was a dearth of products bearing the DU Logo or settings in which it could be seen in and around Baton Rouge. The reasonable inference that Sutton had many opportunities to view the DU Logo based in part on similar experiences by those near to Sutton does not turn on whether their total life experiences are identical to Sutton's.

Because Sutton had an opportunity to view the DU Logo before designing the Boondux Logo, Sutton had an opportunity to copy the DU Logo. The Court finds that Sutton, in fact, viewed and relied on the DU Logo while designing the Boondux Logo. Plaintiff has proven the access element.

### b. Substantial Similarity

The Boondux Logo is substantially similar to the DU Logo's copyrightable elements. The DU Logo depicts a right-facing mallard's head shown in profile. The DU Logo is composed of thick, dark lines with no internal coloration. The Boondux Logo exhibits the same features. As shown by Barnes's and Williams's diagrams, the position of the duck head, bill, eye, and neck are the same in both logos. The neck lines in the Boondux Logo extend below the termination point of the neck lines in the DU Logo and the Boondux Logo has a slightly broader bill than the DU Logo's bill, but the size and proportions of the head, neck,

and bill in both logos are otherwise the same.  The line arcs and curves of both logos' head lines, neck lines, and bills are nearly identical.

Williams, Plaintiff's branding expert, described how both logos "occupy the same space" and how their lines "have the same weight of importance."  He opined that the key similarity between the DU Logo and the Boondux Logo is the shape of the duck head.  In his words, "the way they almost mirror each other is pretty outstanding."  Williams also discussed the variety of duck-themed logos that other brands have used.  He explained how the Boondux Logo does not differ from the DU Logo as to such features as direction, pose, or style of drawing.

As Defendants point out, the Sixth Circuit has instructed that to perform a proper substantial-similarity analysis, the Court must first filter the unoriginal, unprotectible elements out of the original work and then assess whether the allegedly infringing work is substantially similar to any remaining protectible elements in the original.  See Kohus, 328 F.3d at 856-56.  Defendants contend that, when that test is applied to the DU Logo and the Boondux Logo, there is no substantial similarity between the two logos.

Relying on Breaux's opinions, Defendants argue that unoriginal, unprotectible elements of the DU Logo that must be filtered out before any comparison can be done include: "(1) the

idea of a duck drawing; (2) the technique of line drawings; (3) the idea of depicting only a head of a duck; (4) the idea of depicting a duck in profile; and (5) the idea of a rightward-facing duck." (ECF No. 159 at 36-37.) Defendants contend that, as shown by Breaux's diagram depicting the DU Logo and the Boondux Logo each superimposed over a duck silhouette representing the "archetypal form of a duck," any similarities between the two logos and the "archetypal duck" attributable solely to the fact that both logos depict duck heads must also be filtered out. Those similarities include: "(1) shape of the beak; (2) curvature of the back of the head and backward-facing neck; (3) curvature of the chin and frontward-facing neck; (4) placement of the eye region; and (5) proportions of the skull and neck in relation to other parts of the head." (Id. at 38.) Defendants contend that, after filtering out the unprotectible elements, any protectible elements that remain in the DU Logo are not substantially similar to the Boondux Logo.

The Court is not persuaded that the similarities between the DU Logo and the Boondux Logo are a mere collection of unprotectible elements. The similarities include more than the fact that both logos depict right-facing line drawings of a mallard's head in profile. The DU Logo is a particular expression of a duck head. Integral to that expression is, among other details, the distinctive duck head shape that the DU

Logo depicts. The Boondux Logo shares the same distinctive shape. The Court agrees with Williams's opinion that the distinctive shape shared by both logos is the key similarity between them. Although the shape of the logos is only one feature among many that might be compared, that feature is "qualitatively important" and the Boondux Logo's appropriation of that key feature makes the two logos, "taken as a whole, substantially similar in look and feel." Murray Hill, 361 F.3d at 318, 320.

Defendants' arguments do not account for that key similarity. The nearly identical shape shared by the logos is not attributable solely to the fact that both logos depict duck heads. Defendants' arguments assume that there is only one or are only a few ways in which to depict a right-facing line drawing of a mallard's head in profile. Breaux's diagram demonstrates why that assumption is incorrect. Although both logos are alike in that the back neck line, the front neck line, and the bottom of the chin follow the same path and occupy the same space, both logos differ from the "archetypal duck" in the same manner as to those features. Compared to the "archetypal duck," the back neck lines of both logos extend behind the back of the "archetypal duck's" head, the front neck lines of both logos run down the middle of the "archetypal duck's" neck, and the bottom of the chins of both logos falls below the bottom of

the "archetypal duck's" chin.  Based on the evidence Defendants

have presented, the shape of the DU Logo's duck head does not

mirror the "archetypal duck" head.  Instead, it reflects a

unique, particular expression of a duck head.  Breaux agreed

that there are many ways to depict a right-facing line drawing

of a mallard's head in profile and that such a line drawing need

not have the same shape and head and neck curves as the DU Logo.

In designing the Boondux Logo, Sutton could have chosen another

way to depict the shape and curves of his logo's duck head.

Instead, he used a shape and curves that mirror the particular

expression of those elements in the DU Logo.  The Boondux Logo

is substantially similar to the DU Logo in that it copies

elements of the DU Logo that are entitled to copyright

protection.  Plaintiff has proven the substantial similarity

element.[8]

### c.   Independent Creation

Defendants contend that they have presented "overwhelming"

evidence that Sutton independently created the Boondux Logo.

---

[8] Defendants argue that, because neither Barnes nor Williams
performed a filtration step in testifying about their
observations of the two logos, the Court may not rely on their
testimony or diagrams in assessing substantial similarity. (ECF
No. 159 at 41-45.)  Neither witness was offered as a copyright
law expert.  The filtration step is to be performed by the
Court, not the witnesses.  The Court has performed that step and
concludes that the shape of the DU Logo's duck head is a
protectible element.  The Court is not precluded from
considering Barnes's lay observations and Williams's opinions on
logo design in reaching its legal conclusion.

(ECF No. 159 at 45.) A defendant in a copyright action may attempt to rebut an inference of copying that arises from the plaintiff's evidence of access and substantial similarity. See Fogerty, 379 F.3d at 352. Because the Court finds that Sutton, in fact, copied the DU Logo when designing the Boondux Logo, there is no need to consider separately Defendants' independent-creation evidence. As discussed above, the Court does not find Sutton's creation narrative credible. Although Defendants' evidence was "detailed" and in some instances "specific," see Ellis, 177 F.3d at 507, that evidence is entitled to little weight.

### d. Conclusion

The Boondux Logo is creative in the manner in which it combines a fishing hook and a deer antler to form the shape of a duck head. That creativity, however, does not spare Defendants from copyright liability because, despite that creativity, Sutton, in creating the Boondux Logo, had access to and copied protectible elements of the DU Logo that are entitled to copyright protection. Boondux, in turn, has repeatedly sold goods bearing the infringing Boondux Logo and has otherwise used that logo for business purposes. Sutton, as sole owner of Boondux, responsible for its overall and day-to-day operations, and having a direct financial interest in Boondux's infringing activities, is personally liable for Boondux's infringing

conduct.  See Microsoft Corp. v. Sellers, 411 F. Supp. 2d 913, 920 (E.D. Tenn. 2006) ("Sellers").  Plaintiff prevails on its Copyright Infringement Claim.

Plaintiff also asks the Court to find that Defendants' use of the left-facing Signature Boondux Logo infringes its copyrights in the DU Logo.  Other than presenting evidence of Defendants' use of that logo on duck calls and sales figures based on the sale of those duck calls, Plaintiff's evidence, arguments, and the allegations in its Complaint almost entirely address Defendants' creation and use of the right-facing Boondux Logo.  Plaintiff contends that "Defendants have admitted that the [Signature Boondux Logo] is a derivative of the original Boondux Logo, and as such, it also infringes Ducks Ulimited's [DU Logo] copyright."  (ECF No. 158 at 51 n.15.)  Plaintiff cites no authority that any derivative work of an infringing work is likewise infringing.  One court has declined to apply such a rule where the allegedly infringing design was not merely a mirror image of the protected work but a mirror image of a design with "numerous and substantial differences" compared to the protected work.  Medallion Homes Gulf Coast, Inc. v. Tivoli Homes of Sarasota, Inc., 656 F. App'x 450, 454 n.3 (11th Cir. 2016).  The Signature Boondux Logo is not a mirror image of the DU Logo but is instead a mirror image of the Boondux Logo, which, although infringing, nevertheless differs from the DU

Logo as to several design features.  Plaintiff has not carried its burden of establishing that the Signature Boondux Logo infringes Ducks Unlimited's copyright in the DU Logo.

**B.   Trademark Infringement and False Designation Claims**

**1.   General Legal Standards**

Plaintiff's trademark infringement and false designation claims arise under the Lanham Act.  Section 32 of the Lanham Act, 15 U.S.C. § 1114, protects registered marks specifically, and Section 43(A), 15 U.S.C. § 1125(a), protects registered marks, unregistered marks, and other aspects of a good or service.  <u>NetJets Inc. v. IntelliJet Grp., LLC</u>, 602 F. App'x 242, 244 (6th Cir. 2015).

To sustain a claim for trademark infringement, a plaintiff must prove three elements: "(1) it owns the registered trademark; (2) the defendant used the mark in commerce; and (3) the use was likely to cause confusion." <u>Hensley Mfg., Inc. v. ProPride, Inc.</u>, 579 F.3d 603, 609 (6th Cir. 2009).[9]  To sustain a claim for false designation, a plaintiff must prove four elements: "(1) ownership of a specific service mark in connection with specific services; (2) continuous use of the service mark; (3) establishment of secondary meaning if the mark is descriptive; and (4) a likelihood of confusion amongst

---

[9] A defendant need not use the registered mark itself; instead, he may be liable for using a "colorable imitation of a registered mark."  15 U.S.C. § 1114(1)(a).

consumers due to the contemporaneous use of the parties' service marks in connection with the parties' respective services." Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc., 931 F.2d 1100, 1105 (6th Cir. 1991).

The Sixth Circuit "use[s] the same test to decide whether there has been trademark infringement, unfair competition, or false designation of origin: the likelihood of confusion between the two marks." Audi AG v. D'Amato, 469 F.3d 534, 542 (6th Cir. 2006) (citing Two Pesos v. Taco Cabana, 505 U.S. 763, 780 (1992)). In determining whether an alleged infringement of a trade or service mark causes a likelihood of confusion among consumers, courts in this Circuit consider the eight Frisch's factors: (1) the strength of plaintiff's mark; (2) the relatedness of the goods; (3) the similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) defendant's intent in selecting the mark; and (8) the likelihood of expansion of the product lines. Wynn Oil Co. v. Thomas, 839 F.2d 1183, 1186 (6th Cir. 1988) ("Wynn Oil I") (citing Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc., 670 F.2d 642, 648 (6th Cir. 1982)).

"These factors imply no mathematical precision, but are simply a guide to help determine whether confusion is likely." Homeowners, 931 F.2d at 1107. "They are also interrelated in

effect." Id. "Each case presents its own complex set of circumstances and not all of these factors may be particularly helpful in any given case." Id. "The ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." Id.

Plaintiff's claims against Defendants address Ducks Unlimited's trademark rights in the DU Logo. Defendants do not dispute Ducks Unlimited's ownership rights in the DU Logo. Defendants also do not dispute that they have used the Boondux Logo in commerce. Defendants contest Plaintiff's assertions, first, that the DU Logo is a valid, protectible trademark, and second, that Defendants' use of the Boondux Logo creates a likelihood of confusion among consumers.

### 2. Validity and Scope of Plaintiff's Trademark

#### a. Registration-Based Rights

In 2002, the USPTO issued a registered trademark in the DU Logo to Ducks Unlimited. "Registration of a mark on the Principal Register of the USPTO creates a rebuttable presumption that a trademark is valid, that is, either inherently distinctive or descriptive with secondary meaning, and therefore, protectable under federal trademark law." Leelanau Wine Cellars, Ltd. v. Black & Red, Inc., 502 F.3d 504, 513 (6th Cir. 2007) (citing 15 U.S.C. § 1115(a)). Pursuant to 15 U.S.C.

§ 1065, that registration became incontestable in 2008. (ECF No. 152 at 43-44; Tr. Ex. No. 5 (declaration of incontestability).) An incontestable registration is "conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce," subject to enumerated statutory defenses. 15 U.S.C. § 1115(b).

Defendants do not challenge the validity of Ducks Unlimited's registration-based rights in the DU Logo. They challenge the scope of those rights. Because the DU Logo is registered in International Class 35 for "association services -- namely, promoting the preservation of waterfowl," Defendants argue that Ducks Unlimited's registration-based rights do not extend to consumer goods, such as decals, apparel, and other accessories, and that any rights Ducks Unlimited might have in consumer goods are limited to any common law use-based rights that Ducks Unlimited might have acquired. (ECF No. 159 at 49-50.)

To the extent Defendants suggest that Plaintiff's trademark infringement claim under § 32 of the Lanham Act must necessarily fail because Ducks Unlimited has no relevant registration-based rights in the DU Logo with respect to consumer goods, Defendants' argument lacks merit. "The exclusionary rights of a

63

registered trademark owner are not limited to the goods and/or services specified in the registration, but go to any goods or services on which the use of the mark is likely to cause confusion." J. Thomas McCarthy, 4 McCarthy on Trademarks and Unfair Competition § 23:76 (4th ed.).

Amy Batson testified that Ducks Unlimited's association services include its fundraising efforts. (ECF No. 152 at 45.) Defendants offered no testimony or evidence to the contrary. Ducks Unlimited's fundraising efforts include the royalties it generates from sales of products bearing the DU Logo. Many of those products, particularly apparel items, are sold with hang tags informing consumers that a portion of the sales price will be contributed to Ducks Unlimited's wetlands conservation program. (E.g., Tr. Ex. No. 30 (hat).) To the extent that consumers are aware of the numerous DU Logo-branded consumer goods available in the marketplace and are likely to be confused by competing products bearing the Boondux Logo, Ducks Unlimited may vindicate its registration-based rights in the DU Logo as to the sale of consumer goods.

### b. Common Law Use-Based Rights

Ducks Unlimited also has common law use-based rights in the DU Logo as to various kinds of consumer goods. "[I]n the absence of federal registration, prior ownership of a mark is only established as of the first actual use of a mark in a

genuine commercial transaction." *Allard Enters., Inc. v. Advanced Programming Res., Inc.,* 146 F.3d 350, 358 (6th Cir. 1998). "Such use need not have gained wide public recognition, and even a single use in trade may sustain trademark rights if followed by continuous commercial utilization." *Id.* (quotation marks omitted).

Ducks Unlimited has raised tens of millions of dollars from sales of DU Logo-branded consumer goods by its licensees since the late 1980's. Those goods span a range of products, including decals, apparel, and other accessories. Decals have been sold to the consuming public since at least 2007; apparel since at least 1991. Ducks Unlimited has acquired use-based rights in the DU Logo as to those goods, among others.

Defendants resist that conclusion on several grounds. First, Defendants contend that none of the evidence of products bearing the DU Composite Logo, which includes the words "Ducks Unlimited," can be considered in assessing the nature and scope of Ducks Unlimited's use-based rights in the DU Logo standing alone on consumer goods. (ECF No. 159 at 30-34; ECF No. 161 at 2-4.) Defendants assert that many Ducks Unlimited products bear the DU Composite Logo rather than the DU Logo. Defendants point out that Ducks Unlimited's 2003 Corporate Partners Graphics Standards Manual identified the DU Composite Logo as the "official Ducks Unlimited trademark" and that Batson and Barnes

both testified that the DU Composite Logo and the DU Logo are different marks. (See ECF No. 152 at 114; ECF No. 153 at 102.) Defendants argue that, as to composite marks containing both word and design elements, words are presumed to be the dominant portion of the mark. Defendants argue that Plaintiff has failed to rebut that presumption as to the DU Composite Logo by failing to offer evidence showing how the ordinary consumer perceives the DU Composite Logo. Defendants conclude that the DU Composite Logo creates a distinct commercial impression in the mind of a typical consumer and that the Court must not consider Ducks Unlimited's use of the DU Composite Logo in assessing Ducks Unlimited's use-based rights in the DU Logo standing alone on consumer goods.

Defendants' argument is based on the assumption that the word portion of the DU Composite Logo is the dominant part of that logo. Defendants cite In re Viterra Inc. for the proposition that words are presumed to be the dominant portion of a composite mark, but that court "cautioned that there is no general rule that the letter portion of the mark will form the dominant portion of the mark" and that marks "must be considered on a case-by-case basis." 671 F.3d 1358, 1362-63 (Fed. Cir. 2012). Defendants likewise cite McCarthy, but McCarthy states that the "literacy" presumption, which "assumes that words have more impact than designs," is a "dubious generalization."

66

McCarthy, supra, § 23:47 (citing cases finding that design element is dominant if more conspicuous than accompanying words). One court has instructed that, "when a composite includes both words and a design, the design element is likely to dominate if it is more conspicuous or well known to the purchasing public." Ass'n of Co-op. Members, Inc. v. Farmland Indus., Inc., 684 F.2d 1134, 1141-42 (5th Cir. 1982).

Here, there is good reason to conclude that the dominant part of the DU Composite Logo is the duck head, not the words "Ducks Unlimited." Ducks Unlimited has used the DU Logo duck head in conjunction with its Corporate Partners Program since the late 1980's, and all of Ducks Unlimited's licensees use the duck head in some capacity. Jim Alexander testified that the importance of the duck head to Ducks Unlimited's Corporate Partners Program is high and that "everything that Ducks Unlimited stands [for] as a brand is encapsulated into that one mark or that one identity." The duck head appears on 99% of the apparel that Artisans sells. Michael Roberts testified that "you don't have a Ducks Unlimited line without" the duck head. Roberts explained that, without the duck head logo on Artisans products, there is no reason for retailers to place Artisans products alongside competitors' products because a plain Artisans apparel item "really doesn't have any meaning to anybody." Whenever Ducks Unlimited receives special requests

for permission to use the DU Logo on custom-made products, those requests are not for permission to use the DU Composite Logo. Instead, as Barnes testified, requesters "want to see that Duckhead." Because the duck head portion of the DU Composite Logo is the more conspicuous and well known aspect of that logo, Ducks Unlimited's use of the DU Composite Logo is relevant evidence establishing Ducks Unlimited's use-based rights in the DU Logo on consumer goods.

Second, Defendants contend that Ducks Unlimited has not acquired use-based rights in the DU Logo on consumer goods because Ducks Unlimited's licensees use the DU Logo only for ornamentation and not as a source identifier. (ECF No. 159 at 50-53.) Defendants assert that the use of the DU Logo on many Ducks Unlimited-branded apparel items is ornamental based on the size and placement of the DU Logo on those items.

Defendants do not persuasively explain why the use of the DU Logo on consumer goods where the logo is depicted ornamentally necessarily fails to serve a trademark function. Defendants cite McCarthy, but McCarthy states that a "symbol or design that is ornamental and decorative can in addition be a valid trademark" so long as it also "identif[ies] and distinguish[es] a source." McCarthy, supra, § 7:24. Designs that cannot serve as valid trademarks are those that are "*solely* or *merely* ornamental." Id. Sources include secondary sources

such as licensors who authorize licensees to use the licensor's trademark in a manner that indicates sponsorship or authorization of the product. Id. § 3:8. One court has provided a helpful illustration: "[I]f a t-shirt with the stylized 'Cal' logo was sold, Champion may be the direct manufacturer but the University of California, Berkeley, would be the secondary source that authorized Champion to produce and distribute the shirt bearing the school's registered trademark." Macy's Inc. v. Strategic Marks, LLC, Nos. 11-cv-06198-EMC, 15-cv-00612-EMC, 2016 WL 374147, at *3 (N.D. Cal. Feb. 1, 2016).

The numerous examples of products Plaintiff presented show that the DU Logo is used as a trademark. For example, Defendants categorize the use of the DU Logo on a hat manufactured by licensee Outdoor Cap as an ornamental rather than a trademark use. Although the DU Logo on that hat is several inches in diameter and prominently displayed front-and-center, the logo has not been altered artistically in any way. (See Tr. Ex. No. 30 (hat).) Next to the DU Logo is the ®, or "registered trademark," symbol. See Macy's, 2016 WL 374147, at *6 ("[T]he marks at issue are not purely ornamental, but well-known, strong marks that indicate a source, as emphasized by the use of "TM" on the shirts immediately following the marks."). The use of the ® symbol next to the DU Logo is typical of many goods produced by Ducks Unlimited's licensees. (See Tr. Ex.

Nos. 30-38.)  On the hat made by Outdoor Cap, a fabric label sewn into the inseam depicts the DU Composite Logo along with the text, "MANUFACTURED & SOLD UNDER LICENSE FROM DUCKS UNLIMITED." (Id.)  Ducks Unlimited's licensees use the DU Logo in a trademark manner, not merely an ornamental manner, and Ducks Unlimited has acquired use-based rights through its licensees' use of the DU Logo.

Third, Defendants contend that "Ducks Unlimited disclaimed its intent to create trademark rights in the [DU Logo] for clothing and accessories." (ECF No. 159 at 53.)  Defendants point to the settlement agreement between Ducks Unlimited and a third party company in 1990, which gave rise to Ducks Unlimited's "close juxtaposition" requirement for apparel and accessories.  Defendants argue that Ducks Unlimited has acted consistently with that settlement agreement, and thus Ducks Unlimited has not obtained use-based rights in the DU Logo on apparel and accessories. (Id. at 53-56.)

Defendants' argument is a reformulated version of the abandonment argument they made at the summary judgment stage. At that stage, rather than argue that Ducks Unlimited had never acquired use-based rights to apparel and accessories, Defendants argued that Ducks Unlimited had abandoned its use-based rights by entering into and abiding by the 1990 settlement agreement. (ECF No. 88-2 at 8-10.)  In the Court's March 21, 2017 Summary

Judgment Order, the Court rejected that argument, concluding that Ducks Unlimited's compliance with the 1990 agreement did not cause Ducks Unlimited to abandon its trademark rights in the DU Logo and that Plaintiff was not precluded from asserting trademark infringement, false designation, and trademark dilution claims against Defendants based on Boondux's use of the Boondux Logo on clothing and apparel items. (ECF No. 140 at 45-46, 84-85.)

Defendants' arguments place more importance on Ducks Unlimited's intent than the law supports. For purposes of acquiring use-based rights in a mark, what matters is a party's actual bona fide use of a mark in commerce and the public visibility of that use, not the party's intent, which a consumer cannot perceive. In Allard, the Sixth Circuit decided that a company's publically visible, bone fide use of a mark established use-based rights in that mark, unlike the use of a mark by a company in another case discussed by Allard, where the use was not public and bone fide although done with the intent to reserve the mark for the future. 146 F.3d at 357-58, 359-60 (discussing Blue Bell, Inc. v. Farah Mfg. Co., 508 F.2d 1260 (5th Cir. 1975)).

Ducks Unlimited's intent in entering into the 1990 agreement does not matter (nor does its intent about whether the DU Composite Logo is Ducks Unlimited's official logo or a

separate logo).  What matters is what consumers can see, and the consuming public has seen the DU Logo displayed on apparel and accessories for decades.  When viewing the DU Logo head-on, that logo is often all that a consumer may see because Ducks Unlimited's "close juxtaposition" requirement allows the DU Logo and the words "Ducks Unlimited" to appear on different parts of a given product.  Ducks Unlimited has acquired and maintained its use-based rights in the DU Logo on apparel and accessories. Defendants' argument is not well taken.[10]

Fourth, Defendants contend that, "[w]hile numerous products crafted by Ducks Unlimited licensees were entered into evidence, Ducks Unlimited failed to present any evidence that more than one unit of the particular product exists or has been sold."

---

[10] The Court finds persuasive Plaintiff's response to Defendants' settlement agreement-based argument:

> Defendants' argument posits that consumers -- who are very accustomed to seeing the [DU Logo] without any accompanying words, as it appears on the ubiquitous Ducks Unlimited car decals and a host of other products, including apparel -- will not be confused by the Boondux Logo appearing alone on a t-shirt, because they are sophisticated enough to realize that when it comes to t-shirts and sweatshirts, sometimes the [DU Logo] appears near the words "Ducks Unlimited."  This contention puts a remarkable burden of observation, recollection, and analysis on people who are just trying to buy a t-shirt -- and who are certainly unaware of the existence of the Agreement . . . an agreement that has as its purpose the avoidance of consumer confusion and not its facilitation.

(ECF No. 160 at 35 n.8.)

(ECF No. 159 at 56.)  Defendants argue that "Ducks Unlimited did not submit into evidence any exact figures or evidence on where each product is sold, how long that product has been available for sale, the price of the particular products, the number of units sold, and the revenue earned on those items -- let alone any products featuring the [DU Logo] alone."  (Id.)

Plaintiff presented a long parade of products featuring the DU Logo.  The Court does not find that evidence to be a façade.  Since 1986, Ducks Unlimited has raised over $100 million in revenues from its Corporate Partners Program.  Since 1993, sales by Ducks Unlimited's apparel licensees have generated over $6 million in royalties.  Ducks Unlimited has used its DU Logo extensively on consumer goods for decades and has acquired use-based rights in those goods by doing so.

Fifth, Defendants contend that Ducks Unlimited's use of the DU Logo on incentive merchandise made available to members and through chapter events cannot be considered in assessing Ducks Unlimited's use-based rights in consumer goods because use on incentive merchandise "does not meet the necessary requirements of 'in commerce' to establish common-law trademark rights." (ECF No. 159 at 57.)

In support of that argument, Defendants rely on Morgan Creek Productions, Inc. v. Foria International, Inc., 91 U.S.P.Q.2d 1134, 2009 WL 1719597 (T.T.A.B. 2009).  In Morgan

Creek, a film production company holding a registered trademark in the name "Morgan Creek" for films and other recording mediums opposed an application for the same word mark in apparel by a company in the business of selling apparel goods. Id. at *1. Among other grounds, the film company opposed the apparel company's application because the film company had the practice of distributing promotional items, including apparel, that displayed its mark. Id. at *2, *8. The Trademark Trial and Appeal Board decided that the film company had not acquired use-based rights in its mark for apparel goods. Id. at *11.

Morgan Creek is readily distinguishable from this case. In Morgan Creek, the film company distributed its promotional items to employees and friends of the company and never to the general public. Id. at *10. Here, Ducks Unlimited distributes its promotional items to a member base that exceeds half a million. Unlike the exclusive status of the recipients in Morgan Creek, Ducks Unlimited's membership program is easy to join and is readily available to the consuming public. Ducks Unlimited's membership retention rate exceeds 50%, which means that the number of people regularly exposed to Ducks Unlimited's membership program, and consequently to the promotional items Ducks Unlimited makes available to its members, substantially exceeds its 550,000-to-600,000 annual membership figure. In Morgan Creek, the film company was not in the business of

selling apparel using the contested mark.  Id. at *10.  Here, through its licensees, Ducks Unlimited sells to the consuming public the same kinds of goods that it makes available as promotional items through its membership program.  Ducks Unlimited is in the business of selling decals, apparel, and other accessories.  Even were the Court to ignore Ducks Unlimited's use of the DU Logo on incentive merchandise for purposes of assessing Ducks Unlimited's use-based rights in the DU Logo on consumer goods, Ducks Unlimited's use of its logo in its Corporate Partners Program is more than sufficient to establish use-based rights in the DU Logo on consumer goods.

Because Ducks Unlimited owns a valid, protectible trademark in the DU Logo, collectively grounded in its registration-based and use-based rights, including use on consumer goods, Plaintiff may assert trademark infringement and false designation claims against Defendants based on their use of the Boondux Logo in commerce.

### 3.    Analysis of the Frisch's Factors

#### a.    Strength of Plaintiff's Mark

"The strength of a mark is a factual determination of the mark's distinctiveness."  Leelanau, 502 F.3d at 515.  "A stronger mark is accorded greater protection and encroachment upon a strong mark is deemed more likely to produce confusion among buyers."  Id.  Evaluation of the strength factor

"encompass[es] two separate components: (1) 'conceptual strength,' or 'placement of the mark on the spectrum of marks,'[11] which encapsulates the question of inherent distinctiveness; and (2) 'commercial strength' or 'the marketplace recognition value of the mark.'" Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc., 679 F.3d 410, 419 (6th Cir. 2012) (quoting McCarthy, supra, § 11.83). "A mark is strong if it is highly distinctive, i.e., if the public readily accepts it as the hallmark of a particular source; it can become so because it is unique, because it has been the subject of wide and intensive advertisement, or because of a combination of both." Homeowners, 931 F.2d at 1107 (quotation marks omitted).

"Unless a registered mark is successfully challenged within five years of registration, . . . the trademark becomes incontestable" and "the mark must be considered strong and worthy of full protection." Wynn Oil I, 839 F.2d at 1186-87. "Although a trademark may be 'strong and worthy of full protection' because it is valid and incontestable, [Wynn Oil I], 839 F.2d at 1187, that does not necessarily mean that its strength is particularly relevant to the ultimate issue of

---

[11] The spectrum of marks consists of marks that range from "arbitrary," "fanciful," or "suggestive," which are inherently distinctive and protectible, to "descriptive," which are not inherently distinctive but may be protectible if they develop secondary meaning, and "generic," which never qualify for trademark protection. Leelanau, 502 F.3d at 512-13 (discussing distinctiveness-of-mark taxonomy).

whether confusion is likely to occur." <u>Therma-Scan, Inc. v. Thermoscan, Inc.</u>, 295 F.3d 623, 632 (6th Cir. 2002). A mark's incontestable status entitles it to a presumption of strength, but "the relative import of that presumption within the overall strength analysis still requires an analysis of 'whether the mark is distinctive and well-known in the general population.'" <u>Maker's Mark</u>, 679 F.3d at 420 (quoting <u>Therma-Scan</u>, 295 F.3d at 632).

The DU Logo is a strong mark. The DU Logo is entitled to a presumption of strength based on the incontestable status of its registration. Although that registration is limited to association services related to the preservation of waterfowl, as discussed above, Ducks Unlimited's fundraising efforts, which include generating revenues from sales of DU Logo-branded consumer goods, are part of those association services. The presumption of strength of the DU Logo therefore extends to consumer goods.

Registration aside, the DU Logo has both conceptual and commercial strength. The DU Logo has conceptual strength because, as a stylized line drawing of a duck head, the DU Logo is a suggestive mark.[12] Suggestive marks are inherently distinctive. <u>Leelanau</u>, 502 F.3d at 512. Breaux, Defendants'

---

[12] At the summary judgment stage, Defendants agreed that the DU Logo is suggestive, although they now retreat from that concession. (<u>See</u> ECF No. 102 at 28.)

expert witness, agreed that the DU Logo is distinctive. (ECF No. 156 at 7-8.) Because the DU Logo is inherently distinctive, it has conceptual strength.

As discussed above, the DU Logo has developed commercial strength through Ducks Unlimited's extensive use of the logo in conjunction with its conservation, education, membership communications, fundraising, and marketing efforts. About 600,000 members are regularly exposed to the DU Logo with a substantial number of others cycled in among their ranks annually. Ducks Unlimited stamps the DU Logo on each copy of its bi-monthly magazine, on other member communications mediums, and on a variety of incentive merchandise items available to members and chapters. Ducks Unlimited has used its DU Logo in its Corporate Partners Program since the late 1980's, generating over $100 million in revenues since 1987. Products by licensees are carried by national, regional, and independent retailers in store fronts and online. Apparel licensees have used the DU Logo on goods since 1991, and those goods are carried by 200 retailers nationally. Over 10 million DU Logo decals have been distributed to members over the last 20 years, and over a quarter million have been sold to the public since 2007. Millions of devices access Ducks Unlimited's website annually, PSAs aired on national and regional networks have generated over a billion impressions since 2013, millions annually tune in to

watch Ducks Unlimited's television shows, and hundreds of thousands follow Ducks Unlimited through its various social media channels. The DU Logo is featured in each of those contexts. Both nationwide and in Louisiana, millions of people are regularly exposed to the DU Logo on consumer goods and in other sectors of the economy. When people make special requests to use one of Ducks Unlimited's marks on custom-made goods, it is the DU Logo, unaccompanied by the words "Ducks Unlimited," that they ask for.

Defendants contend that the DU Logo does not have commercial strength. They argue that there was scant evidence that consumers recognize the DU Logo. For example, no consumer survey was performed. (ECF No. 159 at 67.) "[C]onsumer surveys are not a prerequisite to establishing secondary meaning." Maker's Mark, 679 F.3d at 421 (alteration and quotation marks omitted) ("In light of the abundance of other evidence demonstrating market recognition, such as Maker's Mark's extensive marketing efforts . . . and its widespread publicity, it was not clear error for the district court to overlook the lack of survey evidence because that evidence was not determinative of the strength of the mark."). Defendants agree that long-term use of a mark and commercial success establish commercial strength, both of which are established by the evidence.

Defendants also contend that the commercial success of a company does not necessarily indicate the commercial success of its trademark. (ECF No. 159 at 67.) Plaintiff did not present evidence of Ducks Unlimited's commercial success unrelated to its use of the DU Logo. All of Ducks Unlimited's licensees use the DU Logo. Ducks Unlimited's apparel licensee uses the DU Logo on 99% of the goods it sells. The evidence establishes that the DU Logo is integral to the commercial success Ducks Unlimited has enjoyed.

Plaintiff has proven that the DU Logo is strong. This factor favors finding a likelihood of confusion.

### b. Relatedness of the Goods

"Cases generally fit into one of three categories regarding the relatedness of the goods and services of the parties." Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr., 109 F.3d 275, 282 (6th Cir. 1997).

> First, if the parties compete directly by offering their goods or services, confusion is likely if the marks are sufficiently similar; second, if the goods or services are somewhat related but not competitive, the likelihood of confusion will turn on other factors; third, if the goods or services are totally unrelated, confusion is unlikely.

Id. "The question is, are the [goods or services] related so that they are likely to be connected in the mind of a prospective purchaser?" Id. at 283 (alteration in original) (quotation marks omitted).

Both Ducks Unlimited and Boondux compete directly by offering related goods.  Both offer t-shirts, hats, decals, and other accessories like keychains and can koozies for sale.  The items offered by each are comparably priced.  Because Ducks Unlimited and Boondux compete directly by offering related goods, consumer confusion is more likely.[13]

Plaintiff has proven that the goods offered by Ducks Unlimited and Boondux are related.  This factor favors finding a likelihood of confusion.

### c.    Similarity of the Marks

"Similarity of marks is a factor of considerable weight." Id.  "This factor entails more than a simple side-by-side comparison of the trademarks in question."  Therma-Scan, 295 F.3d at 633.  "Instead, the relevant inquiry is whether a particular trademark, when viewed alone, would lead to uncertainty about the goods or services that it identifies." Id.  "[C]ourts must determine whether a given mark would confuse the public when viewed alone, in order to account for the possibility that sufficiently similar marks may confuse consumers who do not have both marks before them but who may have a general, vague, or even hazy, impression or recollection of the other party's mark."  Daddy's, 109 F.3d at 283.

---

[13] Defendants' arguments addressing this factor presuppose that the DU Logo is not a valid, protectible mark.  As discussed above, those arguments lack merit.

"[C]ourts must view marks in their entirety and focus on their overall impressions, not individual features." Id.

The DU Logo and the Boondux Logo are very similar. The Boondux Logo depicts a right-facing line drawing of a mallard's head in profile. The DU Logo also depicts a right-facing line drawing of a mallard's head in profile. Despite differences in individual features between the two logos, such as the presence of a hook and antler in the Boondux Logo and the absence of those features in the DU Logo, the overall impression of both logos is the same. When glancing at the Boondux Logo, only after considered reflection does the Court perceive that it is not looking at the DU Logo.

Defendants contend that "Ducks Unlimited's entire argument is based around finding similarities in appearance between the two marks rather than any similarities in impression conveyed to consumers." (ECF No. 161 at 7.) The Court finds that the *impression* that would be conveyed to the ordinary consumer by each logo, not simply each logo's *appearance*, is the same. To the extent Defendants suggest that such a factual finding is impermissible absent market research data or some other such evidence showing actual consumer impressions in the marketplace, no binding legal authority imposes such a requirement. Were it otherwise, trademark holders would be unable to vindicate their rights against infringers unless they could afford to finance

market research surveys and expert witness testimony.  McCarthy states that "[s]imilarity of appearance between marks is really nothing more than a subjective 'eyeball' test" and that "all one can say is 'I know it when I see it.'"  McCarthy, supra, § 23:25.  The Court finds that the logos are similar and convey the same impression.

Plaintiff has proven that the Boondux Logo is unduly similar to the DU Logo.  This factor favors finding a likelihood of confusion.

### d.    Evidence of Actual Confusion

"Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion."  Wynn Oil I, 839 F.2d at 1188.  "Where evidence of actual confusion exists, the weight to which such evidence is entitled varies depending upon both the type and amount of confusion that occurs."  Therma-Scan, 295 F.3d at 634.  "Even though evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion it does not follow that any type or quantum of such evidence is entitled to significant weight in the determination."  Homeowners, 931 F.2d at 1110.  "[C]onfusion that is brief or that occurs among individuals who are not familiar with the products in question is entitled to considerably less weight than are 'chronic mistakes and serious confusion of actual customers.'"  Therma-Scan, 295 F.3d at 634 (quoting Homeowners, 931 F.2d at 1110).

"Due to the difficulty of securing evidence of actual confusion, a lack of such evidence is rarely significant, and the factor of actual confusion is weighted heavily only when there is evidence of past confusion, or perhaps, when the particular circumstances indicate such evidence should have been available." Daddy's, 109 F.3d at 284 (quotation marks omitted).

"The most common and widely recognized type of confusion that creates infringement is . . . point of sale confusion." McCarthy, supra, § 23:5. "Likelihood of confusion at the point of sale involves a purchaser's confusion as to a product's origin or sponsorship occurring at the time of purchase." Gen. Motors Corp. v. Keystone Auto. Indus., Inc., 453 F.3d 351, 355 (6th Cir. 2006) (citing McCarthy). At present, Boondux products are sold only on Boondux's website and at tradeshows.

The Sixth Circuit has also recognized that other kinds of confusion are sometimes actionable, such as initial-interest confusion and post-sale confusion. See Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP, 423 F.3d 539, 549-52 (6th Cir. 2005). Plaintiff has not established that initial-interest confusion is actionable in this case because it has not presented evidence that Defendants have deceptively used the Boondux Logo to lure consumers to Boondux's website or its booth at tradeshows or shown how, if at all, Boondux's advertising efforts are deceitful. See Groeneveld Transp. Efficiency, Inc.

v. Lubecore Int'l, Inc., 730 F.3d 494, 518 (6th Cir. 2013) (discussing the "paradigmatic initial-interest case").[14]  In its Summary Judgment Order, the Court declared that post-sale confusion was not actionable in this case because Plaintiff had not demonstrated a genuine dispute of material fact that products bearing the Boondux Logo were knockoff versions of products bearing the DU Logo.  (ECF No. 140 at 56.)  At issue here is whether Plaintiff presented evidence of actual confusion occurring at the point of sale.

Plaintiff's evidence of actual confusion consists of anecdotal examples of confusion and a market research survey conducted by Hal Poret.  Plaintiff's anecdotal evidence is entitled to little or no weight.  Any confusion by employees of Ducks Unlimited, like Doug Barnes, is legally irrelevant.  They do not qualify as consumers.  See Progressive Distribution Servs., Inc. v. United Parcel Serv., 856 F.3d 416, 434 (6th Cir.

---

[14] "Initial-interest confusion takes place when a manufacturer improperly uses a trademark to create initial customer interest in a product, even if the customer realizes, prior to purchase, that the product was not actually manufactured by the trademark-holder." Gibson Guitar, 423 F.3d at 549.  The Sixth Circuit has been reluctant to extend initial-interest confusion as an actionable theory under the Lanham Act outside the narrow context of disputes over internet domain names.  See id. at 551 & n.15.  In that context, actionable initial-interest confusion may occur where, for example, the defendant uses the plaintiff's word mark in the defendant's internet domain name to direct consumers to the defendant's website.  See id. at 550-51 & n.15 (discussing authorities).  Boondux has not used Ducks Unlimited's name or word mark in the domain name for its website, www.boondux.com.

2017) ("[I]n a trademark infringement action, the focus rests upon the likelihood of a consumer being confused by the two marks and not an employee."). The 25 telephone calls that Barnes received from people asking whether Ducks Unlimited was aware of the Boondux Logo and whether Ducks Unlimited planned to allow Boondux's use of its logo to continue at most suggest the callers' curiosity about Ducks Unlimited's enforcement plans rather than confusion about source, affiliation, or sponsorship of Boondux products. Sutton testified that he encountered some people who asked aloud when looking at the Boondux Logo, "Oh, is that Ducks Unlimited?" Sutton clarified that fewer than 10 people expressed any such confusion and, given the scope of Ducks Unlimited's commercial activity and presence in the marketplace, that minimal evidence "provide[s] only weak support for finding a likelihood of confusion." Therma-Scan, 295 F.3d at 635-36 (finding six instances of consumer confusion legally insignificant given the scale of plaintiff's operations).

Citing Daddy's, Plaintiff argues that "under the appropriate circumstances, even one instance of consumer confusion can increase the likelihood of confusion." (ECF No. 160 at 45.) There is no indication, however, that any of these anecdotal examples of confusion occurred at the point of sale. Even were that so, such minimal evidence of actual consumer confusion, particularly following a full trial on the merits,

"does not tilt the balance of determining whether a likelihood of confusion exists to a significant degree in either direction." Therma-Scan, 295 F.3d at 635-36 (limiting Daddy's fact-specific actual-confusion holding to the summary judgment context).

Plaintiff's consumer survey evidence is not entitled to weight. First, Poret's survey did not test for point-of-sale confusion in the context of sales on Boondux's website or at tradeshows. His survey was limited to testing for point-of-sale confusion in the retail-store context.[15] Poret's survey findings, if reliable, would be relevant for purposes of the expansion-of-product-lines factor, but not for purposes of this factor. Second, as discussed above, Poret's failure to use a proper control image in his survey, or at least to explain to the Court's satisfaction why the image he used, the Drake Logo, was a proper control image and how his quality control measures verified his conclusion, undermines any findings that might otherwise be based on his survey results. "Where a survey presented on the issue of actual confusion reflects methodological errors, a court may choose to limit the importance it accords the study in its likelihood of confusion analysis." Leelanau, 502 F.3d at 518.

---

[15] Poret's survey also tested for post-sale confusion, but for reasons explained in the Summary Judgment Order, the Court does not consider that evidence.

In its Summary Judgment Order, the Court found that, because Poret's survey did not test for point-of-sale confusion in the context of Boondux's website, the "particular circumstances here suggest that, if actual point-of-sale confusion were occurring due to Boondux's internet sales, Poret's survey should have been able to uncover it" and that "this may be the rare case where a lack of evidence of relevant actual confusion weighs against finding a likelihood of confusion." (ECF No. 140 at 70 (citing Daddy's, 109 F.3d at 284).)

Having heard the proof in this case, the Court concludes that Poret's decision not to test for point-of-sale confusion in the context of Boondux's website is not reason to conclude that this factor weighs in Defendants' favor. Poret's survey amounts to lack of evidence one way or the other rather than positive evidence that consumer confusion is not occurring at the point of sale. There was no testimony about how testing conditions emulating the context of Boondux's website might have materially differed from the retail-store conditions that the Test Group attempted to emulate. Presumably such test-group photos would have depicted screenshots from Boondux's website, which displays Boondux's name in proximity to the Boondux Logo, but the Test Group photos Poret used displayed Boondux's name and product labels.

Boondux's website does not have a link to an "About Us" page or otherwise provide any information about Boondux or who owns the website.  The Sixth Circuit has found that the use of a conspicuous disclaimer on a defendant's website can mitigate the likelihood of consumer confusion.  See, e.g., Hensley, 579 F.3d at 608, 611; Taubman Co. v. Webfeats, 319 F.3d 770, 777 (6th Cir. 2003).  Boondux's website, however, has no disclaimer of affiliation with Ducks Unlimited.  Sutton testified that someone visiting Boondux's website "can draw their own conclusions on who Boondux is" and that the website does not provide information "that says this is who we are."  "Web surfers are more likely to be confused as to the ownership of a web site than traditional patrons of a brick-and-mortar store would be of a store's ownership."  Audi, 469 F.3d at 544 (quotation marks omitted).  By designing a survey that did not specifically test for likelihood of confusion in the context of Boondux's website and instead tested for confusion in the retail-store context, Poret did not use Test Group images that withheld disclaimer information that images taken from Boondux's website might otherwise have displayed.  No inference can be drawn in Defendants' favor based on Poret's decision not to test for point-of-sale confusion on Boondux's website.[16]

---

[16] No evidence was presented about what, if any, disclaiming information Boondux provides consumers at tradeshows.  Likewise,

Plaintiff has not presented materially probative evidence of actual confusion among consumers at the point of sale. On the facts of this case, this factor favors neither party.

### e. Marketing Channels Used

"The fifth factor requires an analysis of the parties' predominant customers and their marketing approaches." Therma-Scan, 295 F.3d at 636. Stated differently, this factor considers "how and to whom the respective goods or services of the parties are sold." Homeowners, 931 F.2d at 1110. "The more channels and buyers overlap, the greater the likelihood that relevant consumers will confuse the sources of the parties' products." Kibler v. Hall, 843 F.3d 1068, 1079 (6th Cir. 2016). "Where the parties have different customers and market their goods or services in different ways, the likelihood of confusion decreases." Therma-Scan, 295 F.3d at 636.

That both parties market on the Internet does not "automatically lead to the conclusion that they use common marketing channels." Id. at 637. "Instead, the relevant questions include: (1) whether both parties use the Web as a *substantial* marketing and advertising channel, (2) whether the parties' marks are utilized in conjunction with Web-based

---

no inference can be drawn in Defendants' favor based on Poret's decision not to test for point-of-sale confusion in that context.

products, and (3) whether the parties' marketing channels overlap in any other way." Id. (quotation marks omitted).

Both Ducks Unlimited and Boondux market their products to the same kinds of consumers. The target consumers for Ducks Unlimited-branded consumer goods (as well as its membership demographic) include people interested in hunting, fishing, and the outdoors generally. The target consumers for Boondux-branded consumer goods include the same constituencies. That both Ducks Unlimited and Boondux target the same kinds of consumers favors a likelihood of confusion.

Defendants do not dispute that Ducks Unlimited and Boondux target the same kinds of consumers. Defendants contend that Boondux markets purely commercial goods, but Ducks Unlimited markets "promotional items" to support its conservation work. (ECF No. 159 at 84-85.) Defendants focus on the fact that many Ducks Unlimited-branded products include hang tags describing Ducks Unlimited's conservation efforts and informing consumers that a portion of the sales proceeds contributes to those efforts. (Id.; See, e.g., Tr. Ex. No. 31 (sweatshirt with hangtag).) Defendants reason that, because Boondux's and Ducks Unlimited's missions differ, so do their marketing approaches.

That Ducks Unlimited discloses its conservation mission as part of its marketing efforts does not change the fact that Ducks Unlimited and Boondux target the same consumers. Ducks

Unlimited targets conservationists and Boondux does not, but Ducks Unlimited targets all of the consumers Boondux targets. That Ducks Unlimited uses its revenues for a charitable purpose and Boondux does not does not make their respective marketing approaches materially different. Defendants cite no authority to the contrary.

Ducks Unlimited and Boondux also use some of the same marketing channels. Both market through Facebook, Instagram, and Twitter, and both have participated in some of the same tradeshows. Although Ducks Unlimited uses additional channels, all of the channels that Boondux uses, Ducks Unlimited uses as well. Both use the Internet as a substantial marketing and advertising channel and, based on their mutual participation in tradeshows, both of their channels overlap outside the internet-context. See Therma-Scan, 295 F.3d at 637. The substantial overlap between Ducks Unlimited's and Boondux's marketing channels favors a likelihood of confusion.

Citing Kibler, Defendants contend that the parties' shared use of social media platforms like Facebook, Instagram, and Twitter is of limited relevance in assessing similarity of marketing approaches. (ECF No. 159 at 85.) In Kibler, the Sixth Circuit held that two musical artists' shared use of such websites as Facebook and Twitter for marketing purposes and Amazon and iTunes for targeting consumers was not of

significance in assessing likelihood of confusion because "most musical artists use those websites to advertise and sell their products today." 843 F.3d at 1080. But cf. Audi, 469 F.3d at 544 ("Simultaneous use of the Internet as a marketing tool exacerbates the likelihood of confusion, given the fact that entering a web site takes little effort -- usually one click from a linked site or a search engine's list." (alteration and quotation marks omitted)).

Defendants contend that, under the Kibler standard, this factor favors them because the parties share use of social media platforms for marketing purposes. Kibler found that this factor was neutral. It did not favor the defendant. Although the parties' target consumers and marketing channels overlapped, they overlapped as to users of popular, third-party websites that were widely used. See Kibler, 843 F.3d at 1080. In Kibler, there was nothing narrow, focused, or particularized about the shared target consumers and marketing channels that might have made consumer confusion more likely. See id.

Here, the common target consumers shared by Ducks Unlimited and Boondux are a niche audience, people interested in hunting, fishing, and related outdoor activities, not simply users of popular, third-party websites. The overlap is narrow, focused, and particularized. Both parties have marketed to the same consumers through some of the same tradeshows, a marketing

channel that is also narrow, focused, and particularized. Although the shared use of the widely-used websites Facebook, Instagram, and Twitter for marketing purposes might not be significant if that were the only overlap the parties shared, the overlap between Ducks Unlimited's and Boondux's particularized consumer audiences is highly significant.

Plaintiff has proven that the Ducks Unlimited and Boondux have similar marketing approaches. This factor favors finding a likelihood of confusion.

### f. Likely Degree of Purchaser Care

"Generally, in assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution." Homeowners, 931 F.2d at 1111.

> However, when a buyer has expertise or is otherwise more sophisticated with respect to the purchase of the services at issue, a higher standard is proper. Similarly, when services are expensive or unusual, the buyer can be expected to exercise greater care in her purchases. When services are sold to such buyers, other things being equal, there is less likelihood of confusion.

Id. A key consideration is whether consumers are likely to be confused about the affiliation between two companies. See Therma-Scan, 295 F.3d at 638; Champions Golf Club, Inc. v. The Champions Golf Club, Inc., 78 F.3d 1111, 1121 (6th Cir. 1996). This factor is "less significant than, or largely dependent

upon, the similarity of the marks at issue." Daddy's, 109 F.3d at 286.

The overlapping products that both Ducks Unlimited and Boondux market -- e.g., t-shirts, hats, decals, and other accessories like keychains and can koozies -- are consumer goods. No evidence suggests that typical buyers of the parties' consumer goods are likely to be sophisticated or have special expertise in discriminating among those goods. See Homeowners, 931 F.2d at 1111. Many of the common consumer goods tend to be in the $4-to-$35 price range and are comparably priced. The consumer goods are not especially expensive or unusual. See id. Typical buyers of the goods are not likely to be discriminating and are more likely to be confused about whether Boondux is affiliated with Ducks Unlimited than if the goods were expensive or unusual. Of critical importance, the likelihood of confusion that can be expected due to low customer care as to the inexpensive and commonplace goods in question is exacerbated because the Boondux Logo is so similar to the DU Logo. Cf. Daddy's, 109 F.3d at 286 ("[C]onfusingly similar marks may lead a purchaser who is extremely careful and knowledgeable about the instrument that he is buying to assume nonetheless that the seller is affiliated with or identical to the other party.").

Defendants argue that the multiple uses of the name "Boondux" on Boondux's website and on signage at tradeshows

"indicates that a typical buyer exercising ordinary care is unlikely to believe he had purchased a Ducks Unlimited product when he purchases a Boondux product." (ECF No. 159 at 86.) Although a consumer shopping on Boondux's website or at its booth at a tradeshow is likely to be aware that he or she is dealing with an entity called "Boondux" rather than Ducks Unlimited directly, the use of Boondux's name in those settings does nothing to mitigate the likelihood that a consumer might nevertheless believe that Boondux is affiliated with Ducks Unlimited, a form of confusion no less actionable under the Lanham Act. As discussed above, Defendants have not placed a disclaimer of affiliation with Ducks Unlimited on Boondux's website, and there is no evidence of any disclaiming activity by Boondux at tradeshows. Boondux is not described anywhere on its website. Defendants have not taken steps to mitigate the risk of confusion by ordinary consumers shopping at those points of sale.

Defendants argue that testimony at trial established there are other reasons consumers have, on occasion, become interested in Ducks Unlimited-branded goods. For example, one particular apparel item displayed pictures of puppies. (ECF No. 161 at 8.) These anecdotal examples underscore that many consumers of Ducks Unlimited-branded goods are likely to be less careful.

Typical buyers exercising ordinary caution when purchasing the goods at issue are likely to exercise a low degree of purchasing care. This factor favors finding a likelihood of confusion.

### g. Defendants' Intent in Selecting Mark

"If a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity." Homeowners, 931 F.2d at 1111. "Circumstantial evidence of copying, particularly 'the use of a contested mark with knowledge of the protected mark at issue,' is sufficient to support an inference of intentional infringement where direct evidence is not available." Therma-Scan, 295 F.3d at 638-39 (quoting Champions Golf, 78 F.3d at 1121).

Although "the *presence* of intent can constitute strong evidence of confusion," the "*lack* of intent by a defendant is largely irrelevant in determining if consumers likely will be confused as to source." Daddy's, 109 F.3d at 287 (quotation marks omitted). "Intent therefore is an issue whose resolution may benefit only the cause of a senior user, not of an alleged infringer." Id.

As discussed above, the Court has found that, when Sutton created the Boondux Logo, he had access to and relied on the DU Logo while designing the Boondux Logo. Defendants' used the

Boondux Logo with full knowledge of the DU Logo's existence. That evidence of copying gives rise to the inference that Defendants intended to infringe the DU Logo. See Therma-Scan, 295 F.3d at 638-39.

Citing Groeneveld, Defendants argue that, under this Circuit's trademark law, the intent element is "'not about copying per se but about copying that engenders consumer confusion.'" (ECF No. 161 at 9 (quoting Groeneveld, 730 F.3d at 514).) Defendants contend that "for the factor of intent to weigh in favor of Ducks Unlimited, it must prove that Defendants intended to deceive or confuse customers when it adopted and began use of the [Boondux Logo] in a way that would improperly benefit from any goodwill contained in the [DU Logo]." (Id.)

In Groeneveld, the Sixth Circuit addressed the proper standard for proving intent in a trade dress action. 730 F.3d at 511. The Court held that the appropriate standard is "not the intent to *copy* but rather the intent to *deceive* or *confuse*." Id. at 514. Groeneveld discussed the factor of intent in the context of "trademark law" generally rather than the law of trade dress specifically. See id. at 511-16.

Although Groeneveld spoke of trademark law generally, the Sixth Circuit appears to have limited Groeneveld to trade dress actions. Following Groeneveld, Sixth Circuit decisions have continued to repeat and reinforce the standard for intent

articulated by decisions like Therma-Scan. See, e.g., Progressive, 856 F.3d 416, 435-36; Innovation Ventures, LLC v. N2G Distrib., Inc., 763 F.3d 524, 535-36 (6th Cir. 2014). The Progressive court explained that "knowledge of a trademark, alone, will not support a finding of intent to confuse if other circumstances show that the defendant believed there was no infringement." 856 F.3d at 436. The Progressive court found that the plaintiff's evidence of intent was equivocal where the evidence showed that the defendant's employees acknowledged the existence of the plaintiff's mark but did not believe that the defendant's use of a contested mark would result in a likelihood of confusion because "many companies used similar marks and because the products appear[ed] substantially different." Id.

As discussed above, the evidence supports a finding that Defendants used the Boondux Logo with knowledge of the DU Logo. There is no positive evidence that Sutton believed there was no infringement in Defendants' doing so. Unlike the defendant's employees in Progressive, who testified that they knew of the plaintiff's mark but believed that use of the contested mark was not infringing, Defendants contend that there is no evidence that Sutton knew of the DU Logo or relied on it while designing the Boondux Logo, a contention the Court has rejected.

An inference of intentional infringement by Defendants is supported by the evidence. This factor favors finding a likelihood of confusion.

### h. Likelihood of Expansion of Product Lines

"Inasmuch as a trademark owner is afforded greater protection against services that directly compete or are in the same channels of trade, a 'strong possibility' that either party will expand his business to compete with the other or be marketed to the same consumers will weigh in favor of finding that the present use is infringing." Homeowners, 931 F.2d at 1112. "[A]n affirmative finding will provide a strong indication that the parties' simultaneous use of the marks is likely to lead to confusion, while a negative finding is *not* a strong indication to the contrary." Daddy's, 109 F.3d at 287 (quotation marks omitted).

Sutton testified about the likelihood that Boondux might expand into brick-and-mortar retail stores. Retailers have approached Sutton about the possibility of carrying Boondux products. Boondux's website has a "Retailers" page that encourages retailers to contact Boondux about the possibility of carrying its products and encourages consumers to ask local retailers to do so. Ducks Unlimited-branded products are currently carried by hundreds of retailers of varying sizes nationwide. Given that Ducks Unlimited and Boondux target the

same consumers and offer closely related goods, Defendants'
prospective expansion would exacerbate any likelihood of
confusion that presently exists and create new opportunities for
confusion.

Defendants represent that they are unlikely to expand the
Boondux brand into the brick-and-mortar retail space. They
contend that "Sutton has not meaningfully pursued those
opportunities due to the cost and complications associated with
moving into the retail space." (ECF No. 159 at 87-88.)

Those representations do not accord with the evidence.
Sutton described Boondux's prospective expansion as "very
possible." See Homeowners, 931 F.2d at 1112 (noting that a
"strong possibility" of expansion is legally significant). The
"Retailers" page on Boondux's website invites interested
retailers to contact Boondux and promises, "When we are ready to
offer our product line to retailers you will be contacted
First!" Although Sutton testified about various logistical
considerations that factor into a decision to expand into the
brick-and-mortar setting, he admitted that he had previously
testified in his deposition that his current lack of interest in
retail is "due to mainly the litigation" in this case.

Under this factor, Boondux's prospective expansion need not
be absolutely certain; there need only be a strong possibility.

Sutton's testimony confirms that there is.  This factor favors finding a likelihood of confusion.

### i.   Overall Evaluation of Factors

Having considered each of the eight <u>Frisch's</u> factors, the "ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way."  <u>Homeowners</u>, 931 F.2d at 1107.

There is a strong likelihood of confusion among consumers shopping on Boondux's website or at its booth at tradeshows. The "most significant" facts that drive that conclusion are that the DU Logo is a strong mark and that the Boondux Logo is very similar to that strong mark.  The Sixth Circuit has instructed that the "most important <u>Frisch['s]</u> factors are similarity and strength of [plaintiff's] mark." <u>Maker's Mark</u>, 679 F.3d at 424 (quotation marks omitted) (finding likelihood of confusion where strength and similarity-of-marks factors favored plaintiff); <u>cf.</u> <u>Progressive</u>, 856 F.3d at 436 (finding no likelihood of confusion where strength and similarity-of-marks factors favored defendant).  Here, there is a significant risk that consumers will mistake (and have mistaken) the Boondux Logo for the DU Logo and conclude that Boondux is affiliated with Ducks Unlimited or that Ducks Unlimited otherwise sponsors or approves of Boondux.  Even a careful, observant consumer who happens to notice the antler and fishhook elements in the Boondux Logo

might reasonably believe that Ducks Unlimited is allowing one of its licensees or affiliates to exercise a degree of creative license with the DU Logo for marketing purposes. The risk is not merely that consumers might be reminded of the DU Logo when they see the Boondux Logo, see Groeneveld, 730 F.3d at 519 (citing McCarthy, supra, § 23:9), but that such consumers might believe that Ducks Unlimited stands behind Boondux.

Consideration of additional factors only reinforces that conclusion. The substantial overlap in kinds of consumer goods offered by the parties and the common consumers targeted by each increase the likelihood of confusion. Should Boondux expand into brick-and-mortar retail space, a strong possibility, potential incidents of confusion will increase. Although not dispositive of the inquiry, the absence of any disclaimer of affiliation on Boondux's website or evidence of disclaiming activity at tradeshows serves to ensure that, when consumer confusion does occur, it is unlikely to be dispelled. Defendants have been content to allow consumers to "draw their own conclusions on who Boondux is." That posture is consistent with the evidence giving rise to an inference of intentional infringement by Defendants. Even were Defendants to provide disclaimers of some kind, because the goods at issue are inexpensive and commonplace, consumers are likely to exercise a

low degree of care in perceiving whether Boondux is related to Ducks Unlimited.

The only factor that does not favor a finding of likelihood of confusion is the evidence-of-actual-confusion factor. For the reasons discussed above, that factor is neutral and is not significant in analyzing confusion here.

Because there is a likelihood of confusion among consumers of Boondux's products based on Defendants' use of the Boondux Logo, Defendants' use of that logo has infringed the DU Logo. As sole owner and paid employee of Boondux and as one personally involved in authorizing and directing Boondux's use of the Boondux Logo, Sutton is personally liable for Boondux's infringing activity. See Ohio State Univ. v. Skreened Ltd., 16 F. Supp. 3d 905, 921 (S.D. Ohio 2014); see also Simmons v. Cook, 701 F. Supp. 2d 965, 990 (S.D. Ohio 2010) ("[A] corporate officer who is the 'sole shareholder, officer, and director of the corporate infringer is personally liable. Such liability does not hinge upon the piercing of the corporate veil.'" (quoting McCarthy, supra, § 25:24)). Plaintiff prevails on its Trademark Infringement and False Designation Claims.

## C.   Trademark Dilution Claim

### 1.   General Legal Standards

Plaintiff's Trademark Dilution Claim arises under the Trademark Dilution Revision Act (the "TDRA"), 15 U.S.C.

§ 1125(c).  Under the TDRA, "the owner of a famous mark that is distinctive . . . shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring . . . of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury."  15 U.S.C. § 1125(c)(1).  Dilution by blurring is "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark."  15 U.S.C. § 1125(c)(2)(B).

To sustain a claim under the TDRA, a plaintiff must prove five elements: The "senior mark must be (1) famous; and (2) distinctive.  Use of the junior mark must (3) be in commerce; (4) have begun subsequent to the senior mark becoming famous; and (5) cause dilution of the distinctive quality of the senior mark."  AutoZone, Inc. v. Tandy Corp., 373 F.3d 786, 802 (6th Cir. 2004).

### 2.  Analysis

#### a.  Fame of the DU Logo

"Whether a mark is 'famous' is the threshold issue in a trademark dilution claim."  Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc., 703 F. Supp. 2d 671, 697 (W.D. Ky. 2010).  Under the TDRA, "a mark is famous if it is widely recognized by

105

the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."  15 U.S.C. § 1125(c)(2)(A).  Statutory factors a court may consider in assessing a mark's fame include:

> (i)   The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.
>
> (ii)  The amount, volume, and geographic extent of sales of goods or services offered under the mark.
>
> (iii) The extent of actual recognition of the mark.
>
> (iv)  Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

Id.

The TDRA's protections apply "only to a small category of extremely strong marks." Maker's Mark, 703 F. Supp. 2d at 698. The class of mark holders protected is "far narrower" than is the class protected by "traditional trademark protections." Moore v. Weinstein Co., LLC, No. 3:09-CV-00166, 2012 WL 1884758, at *41 (M.D. Tenn. May 23, 2012) (quotation marks omitted). That is because the TDRA "afford[s] expansive trademark protections" and "permits the owner of a qualified, famous mark to enjoin uses throughout commerce, regardless of the absence of competition or confusion." Id. Marks considered famous enough to be accorded protection under the TDRA include those owned by

such brands as Buick, DuPont, Kodak, Budweiser, Camel, Nissan, Nike, Pepsi, Audi, and Victoria's Secret.  See Maker's Mark, 703 F. Supp. 2d at 698; Bd. of Regents, Univ. of Tex. Sys. ex rel. Univ. of Tex. at Austin, 550 F. Supp. 2d 657, 674, 679 (W.D. Tex. 2008).  "In other words, the mark must be a household name."  Bd. of Regents, 550 F. Supp. 2d at 674.

The TDRA does not protect marks that possess only "niche" fame.  See Maker's Mark, 703 F. Supp. 2d at 697.  In Board of Regents, the University of Texas's ("UT") distinctive longhorn logo was found to possess only niche fame despite evidence that UT football and basketball games are regularly nationally televised on major television networks with national viewership in championship games sometimes exceeding 35 million and that UT had held the record among universities for most licensing royalties in a single year.  550 F. Supp. 2d at 677-78.  That evidence amounted to niche fame because it did not establish that one who is not a college sports fan would recognize the longhorn logo as associated with UT.  Id. at 678.  The court held, "Simply because UT athletics have achieved a level of national prominence does not necessarily mean that the longhorn logo is so ubiquitous and well-known to stand toe-to-toe with Buick or KODAK."  Id.

The DU Logo likewise does not stand toe-to-toe with Buick or Kodak.  Plaintiff has presented evidence that, in 2012, Ducks

Unlimited's membership (including youth) reached almost 600,000 members and that its magazine distribution reached 530,000. Plaintiff has proven that over 5 million unique devices access Ducks Unlimited's website annually, that Ducks Unlimited currently has over 1,000,000 fans on Facebook and over 400,000 followers on Instagram, and that viewership of Ducks Unlimited's television show has climbed to over 3.5 million in the most recent season. Those figures are impressive when viewed in isolation, but they are far exceeded by the level of public recognition UT and its longhorn logo enjoy. If the longhorn logo falls short of the degree of fame required for protection under the TDRA, the DU Logo does so *a fortiori*.[17]

Ducks Unlimited's corporate officers acknowledged that Ducks Unlimited targets a specific niche audience. Both its target members and its target consumers include those interested in wetlands conservation, hunting, fishing, and the outdoors generally. Amy Batson testified that Ducks Unlimited's advertisers "know they reach a very specific niche audience" through Ducks Unlimited's magazine and website. (ECF No. 152 at 81.) Batson explained that advertisers, who have "limited budgets and requir[e] a measurement of return on their

---

[17] Only evidence of the DU Logo's fame as of January 2012 is relevant for purposes of Plaintiff's Trademark Dilution Claim, see 15 U.S.C. § 1125(c)(1), but evidence of present public recognition of the DU Logo is also insufficient to support protection under the TDRA.

investment," have "specific products" with which "they know they're reaching a very target audience" among readers of Ducks Unlimited's magazine. (Id.) Plaintiff attempts to distance itself from that testimony, arguing that magazine readership is not exclusively limited to the target audience, but the advertising expenditure evidence carries substantial weight. Plaintiff has not established that one unaffiliated with the hunting, fishing, and outdoorsman community would recognize the DU Logo as associated with Ducks Unlimited. See Bd. of Regents, 550 F. Supp. 2d at 678.

The DU Logo is a strong mark that is worthy of protection against trademark infringement and other forms of unfair competition. It is not, however, a famous mark under the TDRA.

### b.  Conclusion

Because the DU Logo is not a famous mark under the TDRA, Plaintiff cannot prevail on its Trademark Dilution Claim. The Court need not consider evidence tending to prove the remaining elements of that claim.

### D.  Remedies

### 1.  Damages, Profits, and Other Financial Relief

### a.  General Legal Standards

Under the Lanham Act, a prevailing plaintiff on a trademark infringement or false designation claim "shall be entitled, . . . subject to the principles of equity, to recover

(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a).[18] "The court shall assess such profits and damages or cause the same to be assessed under its direction." Id.[19] Plaintiff asks for an award of Defendants' profits, but not an award for damages.

"In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." Id. "It is not the plaintiff's burden to prove the profits with exactness because the statute places the burden on the defendant once the plaintiff comes forward with proof of the defendant's gross sales." Wynn Oil Co. v. Am. Way Serv. Corp., 943 F.2d 595, 605 (6th Cir. 1991) ("Wynn Oil II"). "[A]n award of profits may be warranted under various rationales, such as unjust enrichment, deterrence, and compensation." Laukus v. Rio Brands, Inc., 391 F. App'x 416, 424 (6th Cir. 2010).

---

[18] The "court in exceptional cases may award reasonable attorney fees to the prevailing party," 15 U.S.C. § 1117(a), but not "where the trademark infringement was not malicious, willful, fraudulent, or deliberate," U.S. Structures, Inc. v. J.P. Structures, Inc., 130 F.3d 1185, 1192 (6th Cir. 1997). Plaintiff has not moved for costs or attorney's fees.

[19] A plaintiff's recovery is also subject to the provisions of sections 1111 and 1114 of Title 15. Neither side suggests that those provisions are implicated here.

"If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." 15 U.S.C. § 1117(a). "Such sum . . . shall constitute compensation and not a penalty." Id. "In weighing the equities," a court may consider such factors as "'(1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off.'" Laukus, 391 F. App'x at 424 (quoting Quick Techs., Inc. v. Sage Grp. PLC, 313 F.3d 338, 348-49 (5th Cir. 2003) (holding that the district court did not err in considering those factors). "The trial court's primary function is to make violations of the Lanham Act unprofitable to the infringing party." Wynn Oil II, 943 F.2d at 606-07 (quotation marks omitted).

Under the Copyright Act, a prevailing plaintiff on a copyright infringement claim may recover either (a) "the copyright owner's actual damages and any additional profits of the infringer" or (b) "statutory damages." 17 U.S.C. § 504(a).

Under the first option, the "copyright owner is entitled to recover the actual damages suffered by him or her as a result of

the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." Id.

In the alternative, the Copyright Act affords a second option:

> [T]he copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $750 or more than $30,000 as the court considers just.

17 U.S.C. § 504(c)(1). If "the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000." 17 U.S.C. § 504(c)(2). "Infringement is willful when the infringer has knowledge that . . . his conduct constitutes copyright infringement." Calibrated Success, Inc. v. Charters, 72 F. Supp. 3d 763, 775 (E.D. Mich. 2014). "In a case where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason

to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200." 17 U.S.C. § 504(c)(2).

The "Lanham Act and the Copyright Act provide separate remedies for the two distinct injuries and serve different public policies." Sellers, 411 F. Supp. 2d at 921 (citing Microsoft Corp. v. Tierra Computer, Inc., 184 F. Supp. 2d 1329, 1331 (N.D. Ga. 2001) ("Tierra"); Nintendo of Am., Inc. v. Dragon Pacific Int'l, 40 F.3d 1007, 1011 (9th Cir. 1994)). Where a defendant commits violations under both acts, a plaintiff's request for remedies under both acts "does not violate the rule against double recoveries." Tierra, 184 F. Supp. 2d at 1331; see also Sellers, 411 F. Supp. 2d at 921; Microsoft Corp. v. Compusource Distrib., Inc., 115 F. Supp. 2d 800, 811 (E.D. Mich. 2000).

### b. Analysis

At trial, Plaintiff presented two exhibits, collectively showing total gross sales figures for all Boondux Logo-branded products that Boondux had sold as of the date of the most recent discovery request.[20] (ECF No. 154 at 30-33; Tr. Ex. Nos. 71 (assorted products sales records), 72 (redacted duck call sales

---

[20] The most recent discovery request was in February 2017. (ECF No. 158 at 55 n.18.)

records).)  Sutton personally prepared both exhibits using analytic software.  (ECF No. 154 at 30-32.)  Sutton was asked by Plaintiff's counsel whether the total sales of Boondux Logo-branded merchandise exceeded $400,000.  (Id. at 44.)  Sutton answered, "If this math is correct, then, yes, ma'am."  (Id.)

Trial Exhibit 71 lists numerous Boondux products and lists the total gross sales figure for each product.  One product, the "Official Logo Decal," is listed twice.  The total gross sales figure for all products, not counting the duplicate Official Local Decal, is $403,716.24.

Trial Exhibit 72 lists numerous versions of Boondux duck calls.  In that exhibit, the gross sales figures are listed for two types of duck calls, each marked with the Boondux Logo.  (See ECF No. 154 at 33.)  The total gross sales figure for those two products is $399.80.  When combined with the total gross sales figure from Trial Exhibit 71 (not counting the duplicate item), the total rises to $404,116.04.  The Court finds that the total gross sales figure for products marked with the Boondux Logo as of the most recent discovery request is $404,116.04.  Absent proof of Defendants' deductible expenses or costs, Plaintiff is presumptively entitled to receive those infringement revenues.

Defendants challenge the reliability of the total, specifically the total gross sales figure derived from Trial

Exhibit 71.  Defendants contend that "many items" in Exhibit 71 "are duplicated and include different numbers."  (ECF No. 161 at 30.)  Only one item in Exhibit 71 is duplicated.  In calculating the $404,116.04 figure, the Court has not included that duplicate.

Defendants also contend that the testimony did not clearly establish that Exhibit 71 reflects gross sales figures for products bearing the Boondux Logo.  They contend that Sutton described Exhibit 71 as "numbers and figures that [his] attorney asked [Sutton] to provide . . . him regarding Boondux sales." (ECF No. 154 at 30.)  Defendants argue that Sutton's testimony did not "connect that the numbers and figures relate to Ducks Unlimited's statement regarding its request for gross sales." (ECF No. 161 at 31.)

The trial testimony is to the contrary.  Plaintiff's counsel asked Sutton: "In our discovery requests in this case, Mr. Sutton, we asked you for the gross sale numbers of everything that you've sold marked with the Boondux logo.  I'm going to show you some documents and ask if you can identify these."  (ECF No. 154 at 30.)  After reviewing the documents, Sutton answered: "Yes, ma'am.  These are the numbers and figures that my attorney asked me to provide to him regarding, yeah, that I needed to, I guess, go and dive in and figure out and provide him regarding Boondux sales."  (Id.)  Sutton agreed with

Plaintiff's counsel's characterization of the exhibit. Defendants' argument is not well taken.

Defendants argue that they have proven deductible expenses and costs. At trial, Defendants presented several tax returns for Boondux for tax years 2013 through 2015. (ECF No. 154 at 110-111, 114, 118; Tr. Ex. Nos. 82 (2013 and 2014 returns), 84 (2015 return).) According to those returns, in 2013, Boondux had total expenses of $27,214.00. (Tr. Ex. No. 82 at CS&B 002934 ln. 28.) In 2013, Boondux had cost of goods totaling $30,448.00. (Id. ln. 4.) In 2014, Boondux had cost of goods totaling $87,535.00. (Id. at CS&B 002939 ln. 2.) Those expenses and costs total $145,197.00.

In 2015, Boondux stated costs for various items. Starting in that year, Boondux began selling products displaying designs other than the Boondux Logo (and other than the Signature Boondux Logo). (ECF No. 154 at 45.) At trial, when asked how much of Boondux's business is attributable to merchandise displaying the Boondux Logo and how much is attributable to merchandise displaying other logos, Sutton answered, "Well, I do know that; but I'd have to produce those documents, again, you know, do the analytics." (Id.) Defendants did not present evidence of the breakdown of costs and expenses attributable to infringing products and costs and expenses attributable to non-infringing products.

The $404,116.04 in total gross revenues of infringing products to which Plaintiff is presumptively entitled must be reduced by Boondux's costs and expenses of $145,197.00 from 2013 and 2014. The evidence demonstrates that, in those years, 100% of Boondux's products were infringing products and thus all costs and expenses during those years are properly deductible from Boondux's total gross revenues of infringing products. That calculation yields $258,919.04. The Court cannot further reduce that figure based on Boondux's costs from 2015 because Defendants failed to prove the portion of those costs attributable to infringing products alone. It is Defendants' burden to prove costs and expenses once Plaintiff has proven gross revenues. See 15 U.S.C. § 1117(a); 17 U.S.C. § 504(b); see also Wynn Oil II, 943 F.2d at 606 (citing Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co., 316 U.S. 203 (1942) ("There may well be a windfall to the trade-mark owner where it is impossible to isolate the profits which are attributable to the use of the infringing mark. But to hold otherwise would give the windfall to the wrongdoer.")); cf. Balsley v. LFP, Inc., 691 F.3d 747, 769 (6th Cir. 2012) ("[I]t has been and remains the defendant's burden to apportion the profits among its costs and other elements that gave rise to its profits, proving causally why certain profits are or are not attributable to the defendant's infringement of the plaintiff's copyrighted

material."). Plaintiff is presumptively entitled to total profits of $258,919.04 for infringing Boondux merchandise.

Having assessed the profits to which Plaintiff is presumptively entitled on Plaintiff's prevailing claims, the Court must consider whether, in weighing the equities, that figure should be adjusted for purposes of Plaintiff's Trademark Infringement and False Designation Claims.[21] Defendants contend, *inter alia*, that Sutton did not intend to deceive consumers into thinking that Boondux was associated with Ducks Unlimited, that Boondux did not benefit from or intend to benefit from any such association, and that there is no evidence that sales were diverted from Ducks Unlimited to Boondux, that Boondux engaged in "palming off," that Ducks Unlimited's membership has been negatively affected by Boondux, or that sales of DU Logo-branded merchandise have declined. (ECF No. 161 at 22, 27, 29.)

Defendants offer persuasive reasons why the Court should not find that the "amount of the recovery based on profits is . . . inadequate." 15 U.S.C. § 1117(a). Other factors, however, counsel that the Court should not find that figure to be "excessive." See id. Nothing warrants departure from Wynn Oil II's instruction that the "trial court's primary function is to make violations of the Lanham Act unprofitable to the

---

[21] Defendants do not contend that the Court may adjust the $258,919.04 figure for purposes of Plaintiff's Copyright Infringement Claim.

infringing party." 943 F.2d at 606-07. An award of infringing profits serves the public interest in making infringement unprofitable, and Plaintiff did not unreasonably delay in bringing this action. See Laukus, 391 F. App'x at 424. Defendants contend that they did not intend to harm Plaintiff, but they point to no meritorious conduct on their part that might have mitigated the effects of their infringing conduct. Any lack of evidence of harm to Plaintiff is less significant here than it otherwise might be given that Plaintiff does not seek damages, only infringing profits. This is not a case where profits are unclear. Plaintiff asks for infringing profits only. Defendants offer no compelling reason why they should be entitled to keep those infringing profits. An award of $258,919.04 to Plaintiff for infringing profits is equitable.[22]

The Court must determine the statutory damages to which Plaintiff is entitled for purposes of the Copyright Infringement Claim should Plaintiff elect that remedy. Defendants infringed only one of Ducks Unlimited's copyrighted works, but Defendants

---

[22] That award amount represents Defendants' infringing profits as of the latest date that Defendants produced total gross sales figures for all Boondux Logo-branded products, February 2017. Plaintiff represents that Boondux has not ceased selling Boondux Logo-branded products. Plaintiff requests an accounting of infringing sales from the date of the most recent discovery production to the date of this decision and contends that it is entitled to any infringing profits Defendants have earned during the interim. (ECF No. 158 at 55 n.18.) Plaintiff must notify the Court within seven (7) days of the entry of this order if it elects an accounting and how it seeks to proceed.

have done so repeatedly, selling thousands of products displaying the Boondux Logo in all 50 states without having ceased to do so and generating upwards of $258,919.04 in infringing profits from those sales. A statutory damages sum of $30,000 is just. See 17 U.S.C. § 504(c)(1).

Defendants have not infringed Ducks Unlimited's copyright willfully. There is no award of increased statutory damages on that basis. Plaintiff cites Calibrated, which held that "[i]nfringement is willful when the infringer has knowledge that . . . his conduct constitutes copyright infringement." 72 F. Supp. 3d at 775. Sutton had access to and copied the DU Logo when creating the Boondux Logo, but no evidence suggests that Sutton knew the design he created, which modified aspects of the DU Logo, would qualify as an infringing work. It does, but Sutton did not know that or act "in reckless disregard" of Ducks Unlimited's rights. Id. (quotation marks omitted).

Examples of reckless disregard that rise to the level of willfulness include (a) repeatedly ignoring warnings from a copyright holder that defendant's behavior violates copyright law, (b) having a history of violating copyright laws, (c) relying on the fair-use defense even after a court has rejected it and entered a consent order forbidding infringing conduct, (d) engaging in a pattern of unreasonable conduct, or (e) exhibiting willful blindness to a copyright owner's rights.

120

Id. (collecting authorities).  There is no clear evidence that Defendants did any of those things.  Even assuming Plaintiff warned Defendants before filing this action, one court in assessing willfulness has focused on whether a reasonable person in defendant's position would have thought that the challenged conduct was likely infringing.  See Ohio State, 16 F. Supp. 3d at 921.  Although mistaken, Sutton might reasonably have believed that, by creatively modifying the DU Logo as he did, he had designed a logo that would not infringe the DU Logo.[23]

Plaintiff is entitled to an award of infringing profits in the amount of $258,919.04 for its prevailing claims.  At its election, Plaintiff may take a statutory damages award of $30,000 in lieu of profits as recovery for its Copyright Infringement Claim.

### 2.  Injunctive Relief

#### a.  General Legal Standards

The remedial provisions of the Lanham Act authorize district courts to "grant injunctions, according to the principles of equity and upon such terms as the court may deem

_____

[23] This finding, that Defendants did not willfully infringe Plaintiff's copyright, is not inconsistent with the Court's finding of an inference of intentional infringement for purposes of the Frisch's factors analysis.  Under that intent factor, a finding of intent is warranted solely based on a finding that the defendant copied the plaintiff's mark.  See Therma-Scan, 295 F.3d at 638-39.  To find willfulness, something more is required.

reasonable," to prevent violations of a trademark holder's rights. 15 U.S.C. § 1116(a). The Copyright Act likewise authorizes district courts to grant "final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a).

"A plaintiff seeking a permanent injunction must demonstrate that it has suffered irreparable injury, there is no adequate remedy at law, that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted, and that it is in the public's interest to issue the injunction." Audi, 469 F.3d at 550 (quotation marks omitted). When considering Lanham Act violations, courts have recognized that "irreparable injury flows both from the potential difficulty of proof of plaintiff's damages, and also from the impairment of intangible values." Wynn Oil II, 943 F.2d at 608 (quotation marks omitted). "The reality of this harm is not negated by the absence of damages." CFE Racing Prods., Inc. v. BMF Wheels, Inc., 793 F.3d 571, 596 (6th Cir. 2015). "For the purpose of an injunction, irreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark because loss of control over one's reputation is neither calculable nor precisely compensable." Id. (quotation marks omitted). The "remedial purpose" of any injunction must

be "to restore to the plaintiff the rightful control over its mark and eliminate the likelihood of confusion of the defendants' products with those of the plaintiff." Id. (quotation marks omitted).

Under the Lanham Act, a court may order that all existing infringing articles "in the possession of the defendant," including "labels, signs, prints, packages, wrappers, receptacles, and advertisements" and "all plates, molds, matrices, and other means of making the same," be "delivered up and destroyed." 15 U.S.C. § 1118. Under the Copyright Act, "the court may order the destruction . . . of all copies . . . found to have been made or used in violation of the copyright owner's exclusive rights, and of all plates, molds, matrices, masters . . . or other articles by means of which such copies . . . may be reproduced." 17 U.S.C. § 503(b).

### b. Analysis

Plaintiff asks that Defendants be enjoined from further use of the Boondux Logo. Defendants agree that a permanent injunction restraining them from further use of the Boondux Logo is an appropriate result based on a finding of liability. Plaintiff will suffer irreparable injury if Defendants are permitted to continue infringing the DU Logo, and an injunction serves to restore to Ducks Unlimited rightful control over its mark and eliminate the likelihood of confusion created by

123

Defendants' use of the Boondux Logo.  Defendants do not have a legitimate interest in being permitted to continue infringing the DU Logo, and an injunction serves the public interest by eliminating the likelihood of confusion among consumers. Defendants are ENJOINED from further use of the Boondux Logo in commerce.

Plaintiff also asks that all infringing articles be ordered destroyed.  Defendants do not address that request.  The Court ORDERS the destruction of all infringing articles currently in Defendants' possession or that might subsequently come into their possession, pursuant to 15 U.S.C. § 1118 and 17 U.S.C. § 503(b).

## V.  CONCLUSION

For the foregoing reasons, the Court finds Defendants liable for copyright infringement, trademark infringement, and false designation of origin or sponsorship.  The Court finds Defendants not liable for trademark dilution.  Plaintiff is entitled to an award of infringing profits in the amount of $258,919.04 for its prevailing claims.  At its election, Plaintiff may take a statutory damages award of $30,000.00 in lieu of profits as recovery for its Copyright Infringement Claim.  Plaintiff must notify the Court within seven (7) days of the entry of this order if it elects to take a statutory damages award of $30,000.00 in lieu of profits for its Copyright

Infringement Claim. Plaintiff must notify the Court within seven (7) days of the entry of this order if it elects an accounting of Defendants' infringing sales from the date of the most recent discovery production to the date of this decision and how Plaintiff seeks to proceed. Defendants are ENJOINED from further use of the Boondux Logo in commerce. The Court ORDERS the destruction of all infringing articles currently in Defendants' possession or that might subsequently come into their possession, pursuant to 15 U.S.C. § 1118 and 17 U.S.C. § 503(b).

So ordered this 18th day of August, 2017.

/s/ Samuel H. Mays, Jr.
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE